Filed 12/2/16

# CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Marriage of KINKA USHER and FREDERIQUE BENHAMOU USHER<br><br>KINKA USHER,<br><br>   Respondent,<br><br>   v.<br><br>FREDERIQUE BENHAMOU USHER,<br><br>   Appellant. | B263721<br>(Los Angeles County<br>Super. Ct. No.  BD491961) |

   APPEAL from an order of the Superior Court of Los Angeles County.  Superior Court of Los Angeles County, No. BD491961, John W. Ouderkirk, Temporary Judge. (Pursuant to Cal. Const., art. VI, §21.)  Reversed.

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller; Freid & Goldsman, Melvin S. Goldsman and Jon Summers for Appellant.

Honey Kessler Amado and James A. Karagianides for Respondent.

_____

Pursuant to an agreement entered into at the time of dissolution, respondent Kinka Usher paid his ex-wife, appellant Frederique Benhamou Usher, child support of $17,500 per month, an amount commensurate with their wealth and lifestyle during the marriage, and the lifestyle respondent continued to live. In March 2015, the trial court granted respondent's request to reduce the monthly child support payment to $9,842, finding a material change in circumstances based on a decline in respondent's employment income. Appellant contends that the court abused its discretion in making that determination because respondent's reduced income did not constitute a material change in circumstances in light of his extreme wealth. Appellant further contends the court imputed an unreasonably low rate of return to respondent's substantial assets, valued at over $67 million.

We agree. We conclude that substantial evidence did not support the trial court's finding of a material change in respondent's circumstances for purposes of meeting his child support obligation. Specifically, we conclude that in light of respondent's overall wealth, the reduction in his employment

2

income did not materially impair his ability to pay the agreed upon child support. We further conclude that the trial court imputed an unreasonably low rate of return to respondent's tens of millions of dollars in assets.

**FACTUAL AND PROCEDURAL BACKGROUND**

Appellant and respondent were married in 2006 and separated in 2008. Their child, Roman, was born in February 2006. Respondent was a successful director and producer during the marriage, earning approximately $4.25 million per year, and owned substantial assets, including cash, investment funds, and real and personal property.

A. *Stipulated Judgment*

The marriage was formally dissolved in October 2009 by stipulated judgment of dissolution (the Stipulated Judgment). The Stipulated Judgment provided for spousal support of $15,329 per month for two years (October 2009 to September 2011). Appellant waived all further right to spousal support.

The Stipulated Judgment also provided that respondent was to pay child support of $12,500 per month and permit appellant and Roman to live in respondent's Pacific Palisades home until June 2010. At the end of that period, appellant and Roman would vacate the house, and

3

respondent would pay an additional $5,000 in child support.[1] The Stipulated Judgment acknowledged: (1) that respondent was a "'high earner'" within the meaning of Family Code section 4057, subdivision (b)(3);[2] (2) that "the child support arrangement set forth . . . was not arrived at pursuant to the California Guidelines provided for in Family Code §§ 4055-4065"; (3) that the deviation from the child

---

[1] Under the child support heading of the stipulated judgment, respondent also agreed to pay Roman's private school tuition of approximately $20,000 per year, to maintain a medical insurance policy for Roman, to pay one-half the cost of Roman's extra-curricular activities, and to make appellant's monthly automobile lease payments.

[2] Section 4057, subdivision (a) provides that the amount of child support established by the complex formula of section 4055 -- a formula that relies heavily on the parents' monthly disposable income -- is presumed correct. (See *Mejia v. Reed* (2003) 31 Cal.4th 657, 670.) Under subdivision (b)(3) of section 4057, a parent with an "extraordinarily high income" need not pay child support commensurate with the formula if he or she establishes "the amount determined under the formula would exceed the needs of the children." Under subdivision (b)(5), the parent may be required to pay more than the formula if its application "would be unjust or inappropriate due to special circumstances in the particular case." A court may deem a party's substantial non-income producing assets "a 'special circumstance' [citation] that may justify a departure from the guideline figure for support payments." (*Mejia v. Reed*, *supra*, at p. 671.) (Undesignated statutory references are to the Family Code.)

4

support guidelines was "in the best interest of [Roman]," whose his needs would be "adequately met" by the parties' agreement; and (4) that each party "had the opportunity to analyze (with his/her respective accountants and attorneys) the expenses and needs of their minor child." The parties "waive[d] the right to seek modification of a non-guideline child support order without making a showing of a material change of circumstances . . . ."

In June 2010, appellant and Roman vacated respondent's Pacific Palisades house and rented a new residence in the same area at a cost of $7,500 per month. Pursuant to the Stipulated Judgment, child support increased to $17,500 per month. Spousal support terminated in September 2011.

B. *Request to Reduce Child Support Payment*

In June 2014, when Roman was eight, respondent filed a request for an order reducing his monthly child support payment to $5,184, plus a percentage of any income he earned above $841,272 annually.[3] The sole basis for his

---

[3] As explained in *In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 95, the family court may award as spousal or child support "a percentage of uncertain earnings" in order to avoid "an indefinite number of future hearings at which the details of income, expenses, investment success or failure, tax consequences and fairness must be reevaluated." These awards are referred to as "*Ostler-Smith*" payments after *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d *(Fn. continued on next page.)*

5

request was that he was then "earn[ing] significantly less than when [the] Stipulated Judgment was negotiated in 2009." He stated that his monthly income had decreased from approximately $350,000 when the parties entered into the Stipulated Judgment to $70,106.[4] The proposed reduced monthly child support figure was obtained by use of the DissoMaster program, inputting $70,106 as respondent's monthly income, deducting for health insurance and

33, 42, the first appellate decision to recognize the family court's discretion to make such awards.

[4] According to the income and expenses statement prepared at the time of the dissolution, respondent's 2009 income included $144,831 per month in salary and over $200,000 per month in other income (dividends, interest, location fees, residuals, profit from his production company, pension contributions and perquisites). In 2014, respondent reported a salary of $41,666 per month and other income (dividends, interest and K-1 income) of $28,440 per month, which he later revised upward to $34,791. Respondent's attached declaration explained that he had shut down his production company at the end of 2013 and was working as an employee for another company. Respondent later explained that he closed his company in 2013 because business and profit had fallen significantly, and asserted that he was earning approximately the same amount working for a third party in 2014 as he had in 2013 from operating his business.

property tax on his primary residence, and presuming custodial time of 30 percent.[5]

Appellant filed opposition, contending that the decrease in respondent's income from employment was not a material change of circumstances warranting modification of the existing child support payment, and that respondent had numerous alternative sources of income and assets from which to pay the agreed upon child support.[6] Her expert,

---

[5] "The DissoMaster is a privately developed computer program used to calculate guideline child support under the algebraic formula required by section 4055." (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1227, fn. 5 (*Williams*).) Respondent attributed zero income to appellant who, although possessing a realtor's license and working ten to 40 hours per week, had reported no income in 2013 or 2014.

[6] Appellant explained that child support funds were used to pay, among other things, Roman's travel expenses when she took him to Europe in the summer to visit his maternal grandparents and to drop him off at respondent's home in Italy. Appellant estimated that Roman's travel expenses averaged $3,300 per month, and that total expenses for the boy were more than $21,000 per month, excluding her one-half share of rent and utilities for their residence. Her estimate included 100 percent of the cost of Roman's extracurricular activities and private school tuition, as she claimed respondent had not paid anything toward the tuition since 2010 and had "consistently failed" to make the stipulated contributions toward extra-curricular activities. Respondent filed a reply declaration criticizing appellant for

*(Fn. continued on next page.)*

7

Michael T. Miskei, a certified public accountant, pointed out that according to respondent's income and expense statement, he had assets of over $67 million -- approximately $37.5 million in liquid assets, and nearly $30 million in real and personal property.[7]  After deducting approximately $2.1 million from respondent's assets to account for the value of the Santa Barbara home Miskei believed to be respondent's primary residence, Miskei opined that conservatively invested in a blend of treasury notes, triple A bonds, and bond funds, respondent's assets could generate income at a rate of 4.5 percent and provide him a monthly cash flow of $260,826, including his salary.  Miskei prepared a DissoMaster calculation based on this income, expenses similar to those deducted by respondent, and an estimated

continuing to employ a nanny, but acknowledging that historically the family had spent the summers in Europe and that since the divorce, appellant had borne the expense of bringing Roman to meet respondent there.

[7]     Respondent owned a home in Montecito valued at approximately $19.2 million, a Santa Barbara home on two lots valued at approximately $2.1 million, another Santa Barbara property valued at $528,000, and a home on the island of Capri, Italy valued at over $6.6 million. Respondent's brief refers to these values as his "equity," but the record reflects the properties were evaluated by the court and the parties at their cost or "book" value, not their possibly higher market value.  Nothing in the record indicates that any of the properties was mortgaged.

custodial time share of 20 percent.[8]  This generated a monthly child support payment of $17,244, nearly identical to the amount appellant was paying under the Stipulated Judgment.

Prior to the hearing on the request for modification, respondent filed a reply, conceding that some income should be attributed to his assets.  In separate declarations, respondent and his expert, Lawrence Goodfriend, a certified public accountant and respondent's business manager, stated that respondent was a cautious investor who did not wish to tie up his assets in long term notes or bonds. Goodfriend opined that the 4.5 percent return estimated by Miskei was "excessive," and that the "assumed rate of return should be 1%," an amount Goodfriend described as "achievable in the current investment world . . . ."  Although neither respondent nor Goodfriend disputed that treasury bonds would be "relatively safe[]," they contended investing in bonds would require respondent to "tie up" his money for decades.  Respondent stated Miskei was mistaken in concluding his primary residence was the $2.1 million Santa Barbara home on two lots, and that he was in fact residing in the $19.2 million Montecito home, while making plans to sell the $2.1 million Santa Barbara property.  In addition, respondent took the position that before attributing any income to his retirement account or his real property, the

---

[8]     Miskei also presumed zero income for appellant.

cost of cashing in those assets should be deducted.[9]  Taking deductions for the cost of cashing in assets and the value of the Montecito home left respondent with investable assets of just under $42.7 million.  Applying a one percent return to this amount resulted in imputed investment income of $35,583 per month, and increased respondent's total monthly income (employment income plus investment income) to $91,609.  Respondent further contended that assets owned by appellant should be expected to generate a similar return and that she should be contributing a share of the imputed income to Roman's support.[10]  Utilizing $91,609 for respondent's income, $1,023 for appellant's income, and continuing to assume respondent had custody 30 percent of the time and the same deductible expenses, respondent generated a revised DissoMaster child support amount of $6,926.

---

[9]  For example, cashing in respondent's retirement account would have incurred early termination expenses as well as state and federal taxes.  Cashing in his real property would have incurred selling costs.

[10]  Appellant's assets, which included cash, investments and an $800,000 apartment in Paris, were valued at $1.227 million.  Respondent imputed income of $1,023 per month to respondent based on a one percent return.

10

C. *Hearing*

At the January 2015 hearing, Miskei testified that after reviewing updated financial records, he had concluded respondent's income from his employment was higher than originally estimated by the parties, viz., approximately $65,000 per month. He imputed income to appellant of $3,455 per month based on the value of her assets. Miskei continued to believe a 4.5 percent return was reasonable and that no more than $2.1 million should be deducted from respondent's assets to account for his personal residence.[11] Inputting the new figures for employment income into the DissoMaster, Miskei calculated monthly guideline child support at $19,099.[12] Miskei denied that his proposed

---

[11] As a general rule, "a supporting parent's home equity . . . may not be considered for the purpose of calculating child support . . . ." (*Williams, supra,* 150 Cal.App.4th at p. 1244.) The rule may be overcome by "a showing of special circumstances under section 4057, subdivision (b), that render guideline support unjust or inappropriate" (*ibid.*), such as a showing that the supporting spouse's residence is a mansion located on substantial acreage. (*In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1362-1364 (*de Guigne*).) Respondent moved into the $19.2 million Montecito residence the month before the hearing.

[12] Appellant presented this calculation solely to demonstrate that the stipulated child support would be within or close to the guideline, even taking into account respondent's reduced salary. She did not seek a change in child support payments.

11

investment strategy was risky or would tie up respondent's investment funds, as the investments could be laddered by buying bonds and notes with different maturity dates.[13]  In addition, Miskei reviewed respondent's investment accounts for three years and found that although the majority of the currently invested funds were in cash and money markets earning less than one percent, approximately $14 million (out of $34.7 million) were in Charles Schwab accounts, returning from 5.5 to 7 percent.  For 2013, Miskei prepared a chart which showed that respondent had $35,060,966 in investment funds on which he earned $861,817, an overall rate of return of 2.46 percent.

Goodfriend testified that respondent had employed a conservative investment strategy, which included having "[$]12 of [$]35 million of his capital in stocks and bonds," and that this strategy had been in place for at least five years. Goodfriend explained that "tying up" capital in long term notes and bonds could lead to a loss if the investor needed to liquidate assets prior to the maturity dates of the notes and

---

[13]    On cross-examination, Miskei acknowledged that the return on 10-year treasury notes had decreased from 2.49 percent when he initially performed his calculations to 1.76 percent as of the date of the hearing, and that the return 30-year treasury notes had decreased from 3.26 percent to 2.32 percent.  He said he would "probably" not use that same overall rate were he to perform the calculations at the time of the hearing.

bonds, but only if interest rates had risen substantially between the time of purchase and the time of sale.

D. *Order*

The court found a "material change in circumstances" warranting a modification of the monthly child support amount, despite respondent's "substantial wealth" and "assets totaling over $67 million." The court concluded respondent's employment-related income was $58,471 per month. The court performed its own calculation for the income to be imputed to respondent's substantial assets. It first took account of the cost of liquidating the real properties on which respondent did not reside (the two lots in Santa Barbara and the vacation home in Italy), deducting five percent for the "cost of a hypothetical sale . . . ." This left $8,807,604 to be invested. The court utilized Miskei's 4.5 percent to impute a rate of return on these funds based on the rationale that "these properties ha[d] not been previously treated as investment property under [respondent's] conservative investment strategy . . . ." This resulted in imputed monthly income of $33,028. To respondent's remaining assets -- $55,971,226 after deducting the value of the non-residential properties and the costs associated with early withdrawal of retirement funds -- the court imputed a one percent rate of return, which the court described as "[respondent's] average" for "at least the last five years," resulting in additional imputed monthly income of $46,642.

13

The court input respondent's actual and imputed income ($140,141/month, according to the court's calculation) and income it imputed to appellant ($3,343/month), and deducted property taxes for respondent's Montecito residence ($6,765/month). This generated a child support amount of $9,842 per month.[14] The court modified respondent's child support to this amount, retroactive to July 2014, when his original request was filed, plus *Ostler-Smith* child support on any income he earned above $1,681,692 per year ($140,141 x 12). The court also ordered appellant to pay all of Roman's tuition, all of his medical insurance premiums, and 85 percent of all mutually agreed upon extracurricular activities and medical expenses not covered by insurance.[15] This appeal followed.

## DISCUSSION

A. *Basic Principles Underlying Child Support and the Applicable Standard of Review for Child Support Orders*

"California has a strong public policy in favor of adequate child support." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 283 (*Cheriton*).) The policy is expressed

---

[14] The court found in favor of appellant on the disputed issue of custody time, finding that respondent had Roman 20 percent of the time, not 30 percent as he had claimed.

[15] The court permitted respondent to deduct 10 percent from his monthly child support payments to recover the "overpayment[s]" since July 2014.

in the statutes embodying the statewide uniform child support guideline, sections 4050 through 4076. The guideline "seeks to place the interests of children as the state's top priority." (§ 4053, subd. (e).) Section 4053 provides that "[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life," that "[e]ach parent should pay for the support of the children according to his or her ability," and that "[c]hildren should share in the standard of living of both parents." (*Id.*, subd. (a), (d) & (f).) The Legislature deems it "appropriate[]" that child support be used to "improve the standard of living of the custodial household" because this "improve[s] the lives of the children." (*Id.*, subd. (f).) Thus, courts have "consistently recognize[d]" that "'where the supporting parent enjoys a lifestyle that far exceeds that of the custodial parent, child support must to some degree reflect the more opulent lifestyle even though this may, as a practical matter, produce a benefit for the custodial parent.'" (*In re Marriage of Hubner* (1988) 205 Cal.App.3d 660, 668 (*Hubner*).) The complex statutory formula used to calculate guideline child support relies heavily on parental income and net monthly disposable income. (§ 4055; see *Mejia v. Reed, supra*, 31 Cal.4th at p. 670.) The guideline "is presumed to be the correct amount," but the presumption "may be rebutted by admissible evidence showing that application of the formula would be unjust or inappropriate" under the "principles set forth in Section 4053 . . . ." (§ 4057, subd. (b).) It is clear

15

from the inclusion of "the broader concepts of station in life, ability to pay, and standard of living" in section 4053 that the Legislature did not intend trial courts to limit their focus "simply to parental income," whether from "salary, return on investment, or any [other] particular source." (*de Guigne, supra,* 97 Cal.App.4th at p. 1366.)

Child support awards and a trial court's determination of a request for modification of child support are reviewed for abuse of discretion. (*Cheriton, supra,* 92 Cal.App.4th at p. 282; *Williams, supra,* 150 Cal.App.4th at pp. 1233-1234.) However, in reviewing a child support order, courts recognize that "'determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule. [Citations.]' [Citation.]" (*Cheriton, supra,* at p. 283; accord, *Williams, supra,* at p. 1234.) "'[T]he trial court has "a duty to exercise an informed and considered discretion with respect to the [parent's child] support obligation . . . " [citation],'" and its "'discretion is not so broad that it "may ignore or contravene the purposes of the law. . . . [Citations.]" [Citation.]'" (*Williams, supra,* at p. 1234; see *In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1106 [appellate courts review support awards for abuse of discretion "with the understanding that a sustainable exercise of discretion requires that the trial court have considered and applied all relevant [statutory] factors"].)

B. *Material Change of Circumstances*

As a general rule, courts will not modify child or spousal support unless there has been a material change of circumstances following the previous determination. (*In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1048 (*Cryer*); *In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 47.) "'[T]he reason for the change of circumstances rule is to preclude relitigation of the same facts' and to bring finality to determinations concerning financial support." (*In re Marriage of Rosenfeld & Gross* (2014) 225 Cal.App.4th 478, 490, quoting *In re Marriage of Baker* (1992) 3 Cal.App.4th 491, 501.) "'Without a changed circumstances rule, "'dissolution cases would have no finality and unhappy former spouses could bring repeated actions for modification with no burden of showing a justification to change the order. Litigants "'are entitled to attempt, with some degree of certainty, to reorder their finances and life style [sic] in reliance upon the finality of the decree.'" [Citation.] Absent a change of circumstances, a motion for modification is nothing more than an impermissible collateral attack on a prior final order.'"'" (*Rosenfeld & Gross, supra*, at p. 490, quoting *In re Marriage of Stanton* (2010) 190 Cal.App.4th 547, 553-554.)

The burden of proof to establish changed circumstances sufficiently material to support an adjustment in child support rests with the party seeking modification. (*Williams, supra*, 150 Cal.App.4th at p. 1234; *Cryer, supra*, 198 Cal.App.4th at p. 1054.) "The ultimate determination of

whether the individual facts of the case warrant modification of support is within the discretion of the trial court. [Citation.]"  (*In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 556 (*Leonard*).)  "[A]n abuse [of discretion] occurs when a court modifies a support order without substantial evidence of a material change of circumstances." (*In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 983 (*McCann*); accord, *In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 398 (*Dietz*); *In re Marriage of Brinkman* (2003) 111 Cal.App.4th 1281, 1292.)

"There are no rigid guidelines for evaluating whether circumstances have sufficiently changed to warrant a child support modification."  (Hogoboom and King, Cal. Practice Guide:  Family Law (The Rutter Group 2016) ¶ 17:40, p. 17-15.)  However, in evaluating a request for modification of an existing support order, the focus is generally on whether there has been "a reduction or increase in the supporting spouse's ability to pay and/or an increase or decrease in the supported [party's] needs."  (*McCann*, *supra*, 41 Cal.App.4th at p. 982; accord, *Dietz*, *supra*, 176 Cal.App.4th at p. 396.) "Each case stands or falls on its own facts, but the overriding issue is whether a change has affected either party's financial status."  (*In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015; see *Leonard, supra,* 119 Cal.App.4th at p. 556 [determination of request for modification of child support may properly rest on "'ability to pay'"]; Hogoboom and King, *supra*, ¶ 17:26, p. 17-12 ["Ordinarily, a factual change of circumstances is required [to support a

18

modification of child support] (e.g., increase or decrease in either party's income available to pay child support)" (Italics omitted)].) Moreover, when the existing support payment was the result of a marital settlement agreement, in determining whether a material change of circumstances has occurred, the trial court is required "'to give effect to [the couple's] intent and reasonable expectations . . . as expressed in the agreement.'" (*Dietz*, *supra*, at p. 399.)

Appellant contends the trial court abused its discretion in modifying the monthly child support respondent stipulated to at the time of the dissolution, because respondent failed to meet his burden of showing a material change in circumstances. We agree. The Stipulated Judgment represented the parties' mutual agreement concerning the amount necessary to meet Roman's financial needs and to support him in accordance with his parents' circumstances, station in life and standard of living. The agreed amount ($12,500, increased to $17,500 after the sale of the Pacific Palisades house) was a small fraction of respondent's then $350,000 per month income, but permitted Roman to continue to live in the neighborhood with which he was familiar, to attend a private school, to enjoy the extra-curricular activities of his peers, and to travel to Europe for his summer vacation as the family had done when it was intact. In moving for modification, respondent presented no evidence of a substantial change in his financial ability to pay the agreed support. His salary continued to place him in the top one percent of earners. His *liquid* assets exceeded

19

$34 million, not including his retirement accounts or the value of the multi-million home on two lots in Santa Barbara he was preparing to sell.  As appellant noted, were respondent to continue to pay the agreed upon $17,500 from June 2014, when he filed the request for modification, until February 2024, when Roman turns 18, he would have paid a total of less than $2 million toward his son's support. Payment of this amount will not materially impact his net worth.  Moreover, despite the reduction in respondent's employment income, he presented no evidence of a cutback in his own lifestyle.  Rather, the evidence established that six months after respondent requested a downward modification of child support, he moved from a $2.1 million residence in Santa Barbara to a $19.2 million home in Montecito, while continuing to maintain his $6.6 million Italian vacation home.

Respondent contends -- and the court apparently agreed -- that the reduction in his income, standing alone, constituted a sufficient change in circumstances to warrant a reduction in child support.  We disagree.  It is "inappropriate" for child support to be based on income alone where the supporting parent "shelter[s] and benefit[s] from substantial assets that produce[] no income . . . ." (*de Guigne, supra*, 97 Cal.App.4th at p. 1362.)  The cases on which respondent relies do not support his contrary contention.  In *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, the husband was terminated from a position paying $447,150 per year and accepted another that

20

reduced his net salary to approximately $10,000 per month, an amount that nearly equaled his support obligation.  (*Id.* at pp. 1384-1385.)  The appellate court specifically found there were no assets from which he could make up the difference (*ibid.*), and that "it exceeded the bounds of reason to require [him] to pay nearly 100 percent of his take-home pay in support payments . . . ."  (*Id.* at p. 1386.)  Similarly in *In re Marriage of Milch* (1975) 47 Cal.App.3d 666, the husband's already modest income was reduced to $604 per month, insufficient to make support payments of $343.  (*Id.* at p. 670.)  There was no evidence of any assets other than a parcel of property he had already quitclaimed to his former wife to settle support arrearages.  (*Id.* at p. 668.)  Here, respondent's child support obligation of $17,500 did not come close to exhausting his monthly income ($91,609, according to respondent, $140,141, according to the court), and respondent had substantial liquid assets from which to pay any necessary expenses not covered by that monthly income.

Multiple courts have held that where the supporting parent has substantial wealth, a trial court abuses its discretion in failing to adequately consider his or her assets before assessing child support.  (See e.g., *Cheriton, supra,* 92 Cal.App.4th at pp. 284-292 [trial court abused its discretion in excluding from consideration father's considerable assets, including stocks and options worth tens of millions of dollars]; *Hubner, supra,* 205 Cal.App.3d at pp. 664, 667 [trial court abused its discretion in awarding $2,215 per month in child support where father was wealthy, enjoyed a standard

of living that greatly exceeded mother's and child's, and stipulated he could pay "any reasonable amount of child support"]; *McGinley v. Herman* (1996) 50 Cal.App.4th 936, 945 [child support order reversed as abuse of discretion where trial court "did not give sufficient consideration to the child's right to share in the standard of living of his extraordinarily high earning father"]; *In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 555-556 [trial court abused its discretion in setting child support that failed to take into account father's conceded wealth and assets, including a Rolls Royce and two residences]; *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1454-1456 [trial court failed to adequately consider father's improved standard of living resulting from his inheritance of a million dollars, used to pay off his mortgage]; see also *Cryer*, *supra*, 198 Cal.App.4th at pp. 1049-1051 [affirming above-guideline child support award to mother temporarily deprived of custody where amount awarded had no significant detrimental impact on wealthy father's financial situation, and mother was in danger of losing child's longtime home while custodial issues were being resolved]; *de Guigne*, *supra*, 97 Cal.App.4th at p. 1357 [affirming order awarding child support three times greater than guideline, where family lived on income from securities and family trusts during the marriage, and father inherited and lived in 16,000 square foot family home set on 47.5 acres].) As the court stated in *Cheriton*, a refusal to consider supporting parents' substantial wealth in setting child support

"effectively permits [them] to avoid [their] obligation[s] to support [their] children according to [their] 'ability, [their] circumstances and station in life,' and [their] 'standard of living,'" and "offends the statutory policies of this state." (*Cheriton*, *supra*, at p. 292, quoting § 4053, subds. (d), (a) & (f).)

Finally, respondent suggests that the reduced child support awarded by the court was adequate because appellant failed to substantiate that it would require Roman to live "at a . . . reduced level." The parties agreed in 2009 that Roman's needs required support from respondent at a level of $12,500 per month as long as he and appellant were living in a home owned by respondent and $17,500 per month thereafter. As the party moving for modification, respondent bore the burden of proving that Roman's financial needs had diminished. He failed to do so. Moreover, the statutory provisions do not require that "each dollar above guideline must in all cases be earmarked for a specific purpose," particularly where the court is attempting to mitigate "an overall decline in the child[]'s standard of living." (*de Guigne*, 97 Cal.App.4th at pp. 1364-1365.) The assumption that a child's "historic expenses" define his or her needs "is erroneous in the case of wealthy parents, because it ignores the well-established principle that the 'child's need is measured by the parents' current station in life.'" (*Cheriton*, *supra*, 92 Cal.App.4th at p. 293, quoting *In re Marriage of Kerr, supra,* 77 Cal.App.4th at p. 96.) "'Clearly where the child has a wealthy parent, that child is

23

entitled to, and therefore "needs" something more than the bare necessities of life.' [Citation.]" (*Cheriton, supra*, at p. 293, quoting *White v. Marciano* (1987) 190 Cal.App.3d 1026, 1032.) In any event, it is clear from the evidence presented by appellant and not disputed by respondent that the reduced support will result in a reduction in Roman's standard of living. The cost of rent and travel alone will consume the support provided, disrupting Roman's life by requiring him to move from the neighborhood in which he has lived at least since the separation. (See *Cryer, supra*, 198 Cal.App.4th at p. 1050 [support order that would result in child's "spending time with his father in an opulent abode and time with his mother in a low-rent apartment" would "conflict[] with the principles of section 4053"].) In short, the court reduced child support without substantial evidence of a material change in respondent's ability to pay, his standard of living, or the amount needed for Roman to maintain a lifestyle commensurate with his own, and which respondent had agreed was "in [Roman's] best interest." This was an abuse of discretion.

C. *Imputation of Income*

Even were we not convinced that the evidence below failed to demonstrate that respondent's financial circumstances had changed sufficiently to warrant modification of his child support obligations, we would nevertheless find the court's imputation of income to respondent's assets inadequate. A court's decision to impute

24

income at a particular rate of return is reviewed for abuse of discretion, but the figure for imputed return must be "reasonable" (*In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1373-1374) and "'have some tangible evidentiary foundation'"; it "'cannot be drawn from thin air.'" (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 756.) Here, the court's imputation of a one percent return to the bulk of respondent's assets was not supported by substantial evidence.

The court's ability to impute income from assets derives from section 4058, which defines "annual gross income" as "income from whatever source derived," and states that "[t]he court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income . . . ." (*Id.* at subds. (a) & (b).) The provision has been consistently interpreted to include the parent's ability to earn income from non-income producing or underperforming assets. (*Perlstein*, *supra*, 137 Cal.App.4th at pp. 1373-1374; *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 644 (*Sorge*); *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1391-1395 (*Destein*); *In re Marriage of Dacumos* (1999) 76 Cal.App.4th 150, 154-155 (*Dacumos*); see *In re Marriage of Scheppers* (2001) 86 Cal.App.4th 646, 650 ["The traditional understanding of 'income' is the gain or recurrent benefit that is derived from labor, business, or property [citation] or from any other investment of capital"].)

The court concluded that imputing a one percent return to the bulk of respondent's assets was reasonable

because it represented "his average [return]" on actual invested funds for the preceding five years. The evidence does not support that finding. Goodfriend and Miskei both testified that at the time of the hearing, respondent had between $34 and $35 million in savings, money market accounts or various investment funds.[16] Respondent presented no evidence of his actual return on these assets. Respondent protested that Miskei's proposed strategy, although "relatively safe[]," would tie up his assets "to produce a 2% or 3% return," without specifying the return he was attaining with his own strategy. Goodfriend said one percent was "achievable in the current investment world" and that respondent had employed a "conservative investment strategy" for the prior five years which involved having "[$]12 of [$]35 million of his capital in stocks and bonds" and the remaining amount in "cash and money markets." But Goodfriend did not provide a figure for respondent's average returns on this mixed portfolio. The only evidence in the record on this point was (1) Miskei's testimony that the one-third of respondent's portfolio not in money markets or cash returned between 5 and 7 percent, and (2) Miskei's chart of respondent's 2013 investment accounts showing an average return of 2.46 percent. The

---

[16]     This amount did not include the over $4 million respondent maintained in retirement funds.

one percent respondent espoused was apparently "drawn from thin air."[17]

Moreover, even had respondent substantiated that his mixed investment portfolio returned only one percent, it would have been an abuse of discretion to limit child support based on that figure. "Just as a parent cannot shirk his parental obligations by reducing his earning capacity through unemployment or underemployment, he cannot shirk the obligation to support his child by under-utilizing income-producing assets" (*Dacumos*, *supra*, 76 Cal.App.4th at p. 155), or "'place . . . a possible source of income "off limits"'" through his or her choice of investment. (*Destein*,

---

[17] We observe that respondent reported actual income from investments (interest and dividends, not including the K-1 income from his business) of $28,208 per month at the time of the request for modification. Respondent acknowledged in his reply brief that some amount of income should be imputed to his considerable book of non-income producing assets. But because Goodfriend imputed a one percent return across the board, rather than limiting that minimal return to the portion of respondent's assets that were not then producing income, Goodfriend's proposed figure for respondent's investment income barely rose, to $35,582. Although the court mitigated this by attributing a 4.5 percent rate of return to respondent's non-residential real estate holdings, because those properties represented a minor part of respondent's assets, the calculation barely moved the overall rate of return on respondent's assets to between 1.4 and 1.5 percent.

*supra*, 91 Cal.App.4th at p. 1395.) A parent cannot "unilaterally, and voluntarily, arrange his business affairs in such a way as to effectively preclude his children from sharing in the benefits of his *current* standard of living" (*In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1082), or "'take a break'" from his or her child support obligations in order to favor non-income producing business investments. (*Sorge, supra*, 202 Cal.App.4th at pp. 647-648, italics omitted.) Respondent and Goodfriend did not dispute that Miskei's proposal represented a conservative investment strategy. They stated respondent did not follow it because he did not wish to tie up his assets in case he needed immediate access to his funds. But respondent had sufficient assets to allow him to keep a significant portion in cash or money market funds for emergencies while still earning more than a one percent return. Imputing an unreasonably low rate of return to appellant's substantial assets, and using that figure to calculate child support would have deprived Roman of funds needed to maintain the lifestyle respondent had agreed was appropriate and which he remained fully capable of providing.

    D. *Conclusion*

We conclude that substantial evidence did not support a finding that respondent's reduction in employment income constituted a material change in his ability to provide the level of child support he had agreed was "in [the] best interest" of his son. The undisputed evidence established

28

that respondent, with assets in the tens of millions of dollars, had ample resources to continue to support his son in a lifestyle commensurate with his own, and that the reduction in respondent's employment income did not materially affect his ability to provide for his child. We further conclude that the court's utilization of a one percent rate of return on respondent's non-real estate investments was unreasonably low. Accordingly, we reverse the order granting respondent's request.

## DISPOSITION

The order modifying child support is reversed. Appellant is awarded costs.

**CERTIFIED FOR PUBLICATION**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

COLLINS, J.