Filed 8/11/23

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re MARRIAGE of KIKIANNE and SCOTT COLE. ———————————————— KIKIANNE COLE,     Petitioner and Respondent, v. SCOTT COLE,     Appellant. | A163975 (Contra Costa County Super. Ct. No. D12-03933) |

The trial court denied Scott Cole's request to reduce or eliminate his child support obligations for calendar year 2020 and awarded attorney fees to Kikianne Cole.[1]  We affirm.  In the published portion of this opinion, we hold the trial court did not abuse its discretion in concluding that Scott's reported salary income in 2020 was not determinative of his ability to pay child support in 2020 and that he possessed sufficient financial assets and imputed

---

\*      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part B of the Discussion.

[1]      Because the parties share the same last name, we refer to them by their first names for the sake of clarity and intend no disrespect.

1

income to meet his child support obligations. In the unpublished portion, we hold the court did not abuse its discretion in awarding attorney fees.

<h2 style="text-align:center">FACTUAL AND PROCEDURAL BACKGROUND</h2>

Scott and Kikianne dissolved their marriage in 2015, and a "Judgment and Marital Settlement" was entered by the court. In November 2019, the parties entered a stipulation and order requiring Scott to pay Kikianne child support in the amount $7,537 per month for their two minor children. The order also required that Scott pay bonus child support in accordance with a bonus wages report table, capped by Scott's gross employment earnings of $2 million per year.

For calendar year 2020, Scott's child support obligations totaled $90,444 ($7,537 x 12 months). Although Scott paid child support for the months of January, February, and March 2020 (totaling $22,611), he stopped making payments in April 2020 without Kikianne's stipulation or an order of the court.

In May 2020, Scott filed a request for an order modifying his 2020 child support obligations. As the sole shareholder and director of his law firm, Scott Cole and Associates (SCA), Scott alleged that his firm encountered severe economic challenges due to the COVID-19 pandemic and that he had stopped taking a salary from SCA as one of several measures to keep his business afloat. He requested that the court suspend child support payments or set payments to zero.

In opposing the modification request, Kikianne contended that Scott maintained assets, income, and access to funds in excess of $20 million and that he essentially failed to disclose all available income to pay child support.

2

After making temporary interim orders to continue child support, the trial court set a long cause hearing for Scott's request and the respective requests of the parties for attorney fees.

The long cause hearing occurred over two days in March and April 2021. The court considered the parties' briefings, received certain of the parties' exhibits into evidence, and heard Scott's testimony. The court also heard the testimony of Mary Beth Yanulis, an attorney and custodian of records for Morgan Stanley Smith Barney and Morgan Stanley Bank NA, which maintained 12 accounts associated with Scott (the Morgan Stanley accounts).

The trial court subsequently issued a proposed decision, to which Scott lodged objections and claims of error. Thereafter the court issued a final written statement of decision with rulings on Scott's objections and claimed errors. In making its rulings, the court indicated it found Scott's testimony "largely unbelievable" concerning his personal finances and transactions. Specifically, the court observed that Scott had little recall of specific and significant facts related to his personal finances and that he was evasive and often impeached by other evidence when questioned about the value of his real estate holdings, the value of his Morgan Stanley investment portfolios and financial holdings, and details of other financial transactions including a loan application he signed in 2019.

Details of the court's factual and legal findings will be addressed in the Discussion, *post*, but for now we note the court denied Scott's modification request and ordered him to pay $90,444, which represented the entire amount of child support due in 2020. The court also ordered Scott to pay Kikianne's attorney fees in the amount of $123,909, finding that the awarded sum "does not impose an unreasonable burden against [Scott], given his

3

financial condition." In its statement of decision, the court commented, "It is unfortunate that an experienced, successful attorney with considerable financial assets and holdings has undertaken vigorous litigation to deprive his children of the support that they require to maintain their status in life. At this point in the litigation, the Parties have spent more money litigating this case than the amount of support that is owed to the Parties' children. The people who suffered most during this ordeal are the [Parties'] minor children."

This appeal followed.

**DISCUSSION**

Scott challenges the trial court's denial of his request to reduce or eliminate his child support obligations for calendar year 2020. He also contends the court's attorney fee award must be reversed. We address these issues in turn.

**A. Denial of Child Support Modification**

California has a strong public policy favoring adequate child support. (*In re Marriage of Usher* (2016) 6 Cal.App.5th 347, 356 (*Usher*).) This policy is set forth in the Family Code[2] (§ 4050 et seq.), which provides for a mandatory statewide uniform child support guideline ("the guideline"). (See *Usher*, at p. 356.) The guideline is a "complex statutory formula" for calculating child support based largely on "parental income and net monthly disposable income" of parents. (*Ibid.*; see § 4055.) In this context, parental income generally means "income from whatever source derived" (§ 4058, subd. (a)), including salaries, bonuses, and interest (*id.*, subd. (a)(1)), as well as "[i]ncome from the proprietorship of a business, such as gross receipts from

---

[2]    All further statutory references are to this code unless otherwise specified.

4

the business reduced by expenditures required for the operation of the business" (*id.*, subd. (a)(2)). The guideline also contemplates that the "earning capacity of a parent" may be considered in lieu of the parent's actual income, "consistent with the best interests of the children." (§ 4058, subd. (b)(1).)[3]

In implementing the guideline, courts must adhere to certain basic principles, including: (1) the "first and principal obligation" of a parent "is to support the parent's minor children according to the parent's circumstances and station in life" (§ 4053, subd. (a)); (2) a parent should pay for the support of the children "according to the parent's ability" (*id.*, subd. (d)); (3) the interests of children are "the state's top priority" (*id.*, subd. (e)); (4) because children "should share in the standard of living of both parents," child support may "appropriately improve" the custodial household's standard of living "to improve the lives of the children" (*id.*, subd. (f)); (5) the guideline seeks to "encourage fair and efficient settlements" of parental conflicts and to "minimize the need for litigation" (*id.*, subd. (j)); and (6) child support orders "shall ensure that children actually receive fair, timely, and sufficient support reflecting the state's high standard of living and high costs of raising children compared to other states" (*id.*, subd. (*l*)).

The amount of child support established by the guideline formula is presumptively correct. (§ 4057, subd. (a).) However, courts may depart from the guideline amount under several circumstances, including those situations

---

[3] At the time of the long cause hearing below, the same earning capacity language appeared in former subdivision (b) of section 4058. Effective September 27, 2022, subdivision (b) of section 4058 was divided into three subdivisions, and the quoted language was placed in subdivision (b)(1). (Stats. 2022, ch. 573, § 4 (Assem. Bill No. 207).) For the sake of clarity this opinion cites to the current statutory provision.

5

in which " '[a]pplication of the formula would be unjust or inappropriate due to special circumstances in the particular case." (§ 4057, subd. (b)(5).) For instance, one court found special circumstances where a parent who was a principal of a company voluntarily agreed to defer a substantial portion of his salary while still working full time and using his other assets to continue living a wealthy lifestyle. (*In re Marriage of Berger* (2009) 170 Cal.App.4th 1070 (*Berger*).)

As indicated above, Scott and Kikianne entered a stipulation and order in November 2019 that fixed Scott's monthly child support obligations at $7,537 ($90,444 annually). Six months later, Scott filed a motion requesting reduction of child support to zero because: "My financial situation has changed significantly and negatively as a result of the COVID-19 pandemic. I have not been able to afford to take a salary for myself since February 2020 in an effort to keep my business going." Scott claimed that his law firm SCA was able to collect "only a fraction" of the settlements and judgments it was owed and that SCA laid off three employees and slashed its expenses by at least 25 percent in order to survive. He also represented that he and his current spouse were living off their savings, carrying two mortgages, and trying to avoid foreclosure.

Generally, courts will not modify child support "unless there has been a material change of circumstances following the previous determination." (*Usher*, *supra*, 6 Cal.App.5th at p. 357.) Where, as here, a parent seeks to reduce a support order, that parent shoulders the burden of proving changed circumstances (*id*. at pp. 357–358) and a lack of ability and opportunity to earn the income necessary to pay the court-ordered support (*In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1246–1247 (*McHugh*); see *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 556 [determination of

6

modification request may properly rest on the fluctuations in ability to pay]). " 'There are no rigid guidelines for evaluating whether circumstances have sufficiently changed to warrant a child support modification.' " (*Usher*, at p. 358.) Though determinations must be made on a case-by-case basis, the " 'overriding issue is whether a change has affected either party's financial status.' " (*Ibid*.)

An order denying child support modification is reviewed for abuse of discretion and will be reversed "only if prejudicial error is found from examining the record below." (*In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1371.) However, the matter of child support is highly regulated, and a trial court may exercise discretion only as provided by statute or rule. (*Ibid*.) Accordingly, an order that hinges on a matter of statutory interpretation presents "a question of law that we review de novo." (*Id*. at pp. 1371–1372.)

By the time of the long cause hearing, Scott submitted evidence that SCA paid him a salary of $100,000 for all of 2020. The trial court denied Scott's modification request after finding that his $100,000 income from SCA was "just one factor" to consider. Holding Scott to his burden as the party seeking a reduction, the court determined that Scott "failed to prove, by a preponderance of the evidence, that he and SCA experienced a material change of circumstances to warrant an adjustment or suspension" of his 2020 child support obligations and also failed to prove "by a preponderance of the evidence that the gross receipts received by SCA, reduced by expenditures required for ongoing operations, left him with insufficient income, assets, or access to funds" to meet such obligations. (See *McHugh*, *supra*, 231 Cal.App.4th at pp. 1246–1247; *Usher*, *supra*, 6 Cal.App.5th at pp. 357–358.) In short, the court concluded that Scott's $100,000 income was "not

7

determinative of his ability to pay" his 2020 child support obligations and that Scott "maintains sufficient earning capacity and imputed income" to meet such obligations. For the reasons that follow, the trial court did not err or abuse its discretion in so concluding.

There is no dispute that Scott is the only shareholder and sole director of SCA. Likewise, there is no dispute that SCA "is substantially under" Scott's control and that Scott "has the unilateral ability to set his income." As Scott explained in his testimony, he determines the amount of income that SCA pays to him "based on the needs of the business and based on personal needs," and "if the income is needed on the personal side" and "the business can afford it," then he "can make adjustments."

The evidence showed that, from 2017 through 2019, Scott reported his salary from SCA as follows. In 2017, Scott received a salary of $11,126,167. In 2018, Scott received a salary of at least $578,767. Although no tax return for 2019 appears in the record, Scott claimed a base income of approximately $117,000 per month ($1,404,000 for the year) in a residential loan application that he signed on October 11, 2019. Scott also stated in that application that he had total assets (stocks, bonds, real estate) worth $6,419,040 and a net worth over $4 million. As the trial court properly recognized, statements by a party—such as the ones Scott made in the 2019 loan application—are competent and admissible on issues related to the calculation of child support. (*In re Marriage of Calcaterra and Badakhsh* (2005) 132 Cal.App.4th 28, 34–35.)

For 2020, the year at issue here, Scott reported salary income of $100,000 on his tax return. But there was also evidence that in 2020, SCA maintained $1.4 million in reserves for law firm operating and capital expenses, and the court so found. Although the court determined that funds

reserved for SCA's day-to-day operations were *not available* for Scott's 2020 child support obligations, the court found that a portion of the $1.4 million was held "in reserves for 'long-term investments' " and that such portion was not required for SCA's day-to-day operations.

This latter finding is important because the trial court had discretion under section 4058, subdivision (b)(1), to consider "the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children."  Accordingly, even though Scott drew a salary of only $100,000 in 2020, the court could properly consider whether the evidence of Scott's earning capacity warranted imputation of additional income.

Here, substantial evidence supports the trial court's imputation of income in excess of Scott's actual salary.  Specifically, Scott's testimony indicated there were two Morgan Stanley accounts holding reserves for SCA operations and long-term investments.  Account documents showed that on December 1, 2020, the two accounts together contained over $925,000 ($307,716 in one account and over $615,000 in the other), and their combined balance amounted to ten times the amount of child support due in 2020. Despite Scott's vague assertions to the contrary,[4] it was reasonable for the court to infer that SCA had sufficient funds in its reserve accounts to pay Scott a salary that was more commensurate with his work and professional experience as a full-time class action attorney, or at least a salary that would have covered his 2020 child support obligations, while leaving adequate

---

[4]     The record supports the court's observations that:  (1) Scott's testimony was "inconsistent with documents admitted into evidence" and appeared "either intentionally ambiguous or deliberately obscure"; (2) Scott demonstrated a failure to "remember or recall specific and significant facts related to" his October 2019 loan application, investment portfolios, and financial holdings at Morgan Stanley; and (3) Scott responded to questions in an "evasive manner."

reserves for SCA's operational expenses. On this record, no abuse of discretion appears.

Moreover, the trial court had discretion to depart from the income-based child support amount set by the guideline formula due to the special circumstances demonstrated in this case. (§ 4057, subd. (b)(5).) Here, the court determined that Kikianne "proved, by substantial evidence, that [Scott] has significant net worth, assets, income and earning capacity available to pay" his 2020 child support obligations. Such proof included the evidence that: (1) Scott voluntarily and substantially slashed his salary to $100,000 even though his earning capacity was much higher and SCA has sufficient non-operating reserves to at least cover the $90,444 he owed for child support; (2) in lieu of Scott's taking a larger salary to meet his personal and family expenses in 2020, Scott and his current spouse evidently covered such expenses in part by taking distributions totaling at least $977,000 from their non-retirement Morgan Stanley accounts; and (3) Morgan Stanley accounts paid at least $387,245 of Scott's personal and business credit card expenses in 2020.[5] On this record, substantial evidence supports the trial court's departure from the statutory guideline amount and its denial of Scott's modification request.

We find analogous support for our conclusion in *Berger, supra,* 170 Cal.App.4th 1070. In that case, the father quit his high-paying job at an accounting firm in order to serve full time as president and chief executive officer of his startup landscaping company. (*Id.* at p. 1075.) From its inception, the startup company had "never generated a profit," and

---

[5]     The trial court found that Scott commingled personal and business expenditures charged to the credit card and that it was unclear whether the bulk of the expenditures were for personal or business purposes.

eventually the father and other principals guaranteed certain loans to the company and voluntarily agreed to reduce their salaries and defer income. (*Ibid*.)  The father also loaned the company $250,000.  (*Ibid*.)  At trial on the father's request to reduce his temporary child support obligation, the father testified his landscaping company had recently been paying him an income of $2,000 per month, but that "his total 'deferred' salary—defined as the difference between the compensation his employment contract had specified he was entitled to receive, and the compensation he had actually received— was as high as $350,000 by the time trial commenced."  (*Id*. at p. 1076.)  He had agreed to his salary reduction and income deferral to avoid further depleting his company's capital, which he believed would harm his company's "ability to raise further capital in the future" and "thus imperil its viability." (*Id*. at pp. 1081–1082.)  The father explained his personal expenses were over $21,000 per month (*id*. at p. 1076), which "in the absence of any significant cash salary" from his business, he was meeting "by utilizing his cash assets." (*Id*. at p. 1077.)  The father estimated he had $430,000 to $450,000 left in liquid assets and equity of $500,000 in a property he had purchased and developed with a $1.8 million loan.  (*Id*. at pp. 1076–1077.)

In view of the foregoing record, the trial court in *Berger* first concluded " 'there was insufficient evidence' demonstrating [the father] had any current 'opportunity' to earn the level of salary he once had while working in finance" and "declined to impute that salary to him 'for the calculation of support and fees.' "  (*Berger*, *supra*, 170 Cal.App.4th at p. 1078.)  Although the court reserved jurisdiction over the father's deferred salary of $350,000, the court adhered to the statutory guideline because the father received no actual income other than his monthly $2,000 salary.  (*Ibid*.)  The court ordered the father to pay only $1,115 in monthly support for his two children based on

11

that salary and imputed interest income on his cash assets and estimated equity in the property he had purchased. (*Ibid.*)

The appellate court reversed, concluding that section 4057, subdivision (b)(5), allows courts to depart from the guideline amount of support under " 'special circumstances.' " (*Berger, supra,* 170 Cal.App.4th at pp. 1083–1084.) In determining that special circumstances were established in the case, *Berger* observed that the father was "simply choosing to *invest* his salary each month back into the company, while supporting his own lifestyle with other assets." (*Id.* at p. 1074.) Significantly, *Berger* held that the father's voluntary agreement to defer his income from his startup business, while continuing to live a wealthy lifestyle by using his other substantial assets for his own support, did not justify reducing his obligation to pay child support. (*Id.* at pp. 1073–1074.) As *Berger* recognized, a father may not "unilaterally, and voluntarily, arrange his business affairs in such a way as to effectively preclude his children from sharing in the benefits of his *current* standard of living." (*Id.* at p. 1082.) There, the father "could have just as easily chosen to retain his salary—which after all, he needs to support himself—*and his family*—and instead utilize his *other assets* to fund monthly capital investments into his company." (*Ibid.*) Thus, even if the father's "decision to forgo *receipt* of his salary" precluded the trial court from characterizing the deferred salary as income for purposes of support, *Berger* concluded the situation "demonstrates 'special circumstances' which warrant a departure from the guideline amount of support" awarded by the trial court. (*Id.* at p. 1083; see also *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 648 (*Sorge*) [recognizing parental obligation "not to voluntarily act in a way that negatively impacts the support that a child is entitled to receive from that parent"].)

12

The record here establishes comparable special circumstances. Just like the father in *Berger*, Scott was a relatively wealthy individual who worked full time in a business that did not turn a profit during a year in which he had child support obligations to meet. And similarly, as a principal of the business—indeed, the only principal—Scott had the "unilateral ability to set his income," and he voluntarily and substantially reduced his salary out of a stated concern that he could not keep SCA in business unless he did so. Also similarly, despite slashing his 2020 annual salary to $100,000, Scott maintained a relatively affluent lifestyle and relied on other resources to pay his personal and current family expenses that far exceeded his reduced income.[6] On this score, Scott and his current spouse received over $977,000 in account distributions from Morgan Stanley in 2020, and Scott was able to tap certain Morgan Stanley accounts to pay at least $387,245 in credit card charges for his personal and business expenses incurred in 2020. Thus, like the father in *Berger*, Scott evidently chose to substantially reduce his salary while continuing to support his lifestyle using other available assets, instead of drawing a salary that would cover his child support obligations and using those other assets to keep his business going.

It bears emphasizing that one of the principal facts distinguishing this case from *Berger* is one that does not work in Scott's favor. In *Berger*, the father's startup business had "never generated a profit" from its inception. (*Berger*, *supra*, 170 Cal.App.4th at p. 1075.) Here, however, SCA experienced several profitable years leading up to 2020 and evidently had sufficient non-operating reserves to pay Scott a salary that would have covered his child support obligations. As Scott himself explained, "if the income is needed on

---

[6]     Scott's income and expense declaration, dated December 3, 2020, showed monthly expenses totaling $41,283.

the personal side" and "the business can afford it," then he "can make adjustments." Though Scott attempts to distinguish his case from *Berger* by claiming his decision to take a substantially reduced salary was not voluntary but instead critical to SCA's economic survival, the evidence of SCA's available reserves belies that claim. Thus, the record supports the inference that Scott voluntarily chose to adjust his income downward for 2020 because, notwithstanding the fact that his monthly personal expenses outstripped his substantially reduced salary, he had other assets and means to pay such expenses. In sum, there was substantial evidence in the record establishing special circumstances that justified the trial court's denial of modification.[7]

In challenging the denial of modification, Scott takes issue with the trial court's findings that Scott "maintained sufficient income in late 2019" that "carried over to 2020" as "available income," and that the Morgan Stanley distributions of $977,000 and Scott's 2020 credit card expenses of $387,345 could be imputed as income in 2020. In Scott's view, these findings erroneously imputed the value of his assets and credit card debt as 2020 income. We see no basis for relief.

---

[7]     We acknowledge the trial court did not articulate it was proceeding pursuant to the discretionary "special circumstances" provision set forth in section 4057, subdivision (b)(5). Accordingly, we requested and received supplemental briefing from the parties addressing the relevance, if any, of the *Berger* and *Sorge* decisions to the issues in this appeal. Having carefully reviewed the record and supplemental briefing, we conclude we may affirm the trial court's order denying modification because the court's findings were aligned with the type of special circumstances found in *Berger* and were supported by substantial evidence. (See *Sorge, supra*, 202 Cal.App.4th at p. 645 [finding trial court's child support decision proper under former § 4058, subd. (b), despite court's failure to say it was proceeding under that statute]; see also *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [ruling may be upheld on any basis, even if that basis was not actually invoked].)

14

Whether or not it was legally accurate to characterize Scott's 2019 income as income that "carried over to 2020," the court could properly impute income in excess of Scott's $100,000 salary based on his earning capacity and the evidence of SCA's non-operating reserves in 2020 that could have added to Scott's salary. (§ 4058, subd. (b)(1).) To the extent Scott suggests the subject reserves consisted of SCA's income earned in previous years that was improperly "double-counted" as income in 2020, he cites no authority supporting the notion. Moreover, the court could otherwise properly consider the Morgan Stanley distributions and credit card payments as evidence supporting its implied finding that it would be "unjust or inappropriate" to apply the guideline formula under the facts in this case. (§ 4057, subd. (b)(3); *Berger*, *supra*, 170 Cal.App.4th 1070.) All in all, the trial court's order advanced the legislative goals of child support by ensuring that Scott pays for the support of his children according to his ability (§ 4053, subd. (d)); that the interests of his children are regarded as a top priority (*id.*, subd. (e)); and that the children share in Scott's standard of living (*id.*, subd. (f)).

Finally, Scott contends the trial court erroneously failed to consider section 4057.5, which provides that a new spouse's income may not be considered when modifying child support. But the record reflects that Scott had not raised the issue of section 4057.5's potential applicability in his filings supporting the modification request or in his trial brief, even though Kikianne had consistently argued that the totality of the Morgan Stanley assets, distributions, and credit card payments are properly considered for denial of modification. It was only after the long cause hearing that Scott contended, in his closing brief, that 50 percent of the balances in the Morgan Stanley accounts he held for SCA or with his current spouse should be excluded in determining his available income. When the trial court issued its

15

proposed decision in Kikianne's favor, Scott for the first time cited section 4057.5. The trial court was not swayed, noting that Scott had offered no detailed evidence of his current spouse's income or assets.

Scott points to no evidence contradicting the court's finding. Indeed, it must be remembered that Scott was the party seeking to change the status quo. It was therefore his burden to prove his circumstances had so changed that he lacked the ability and opportunity to meet his child support obligations from whatever fractional portion of his earning capacity and the Morgan Stanley accounts he believed would be appropriate. (See *Usher*, *supra*, 6 Cal.App.5th at pp. 357–358.) This he did not do.

**B. Attorney Fee Award**

The trial court's proposed statement of decision indicated that, based on a provision in the parties' marital settlement agreement, Kikianne was "the prevailing party" and "entitled to an award of attorney's fees in the amount of $123,909 incurred for this litigation." Scott objected to the proposed award on two grounds: (1) the court incorrectly concluded that the attorney fee clause in the marital settlement agreement provided a basis for the proposed attorney fee award and (2) the proposed award incorrectly included hours expended in different proceedings. Upon considering Scott's objections, the court awarded Kikianne $123,909 in attorney fees based on section 271 and found the award did not impose "an unreasonable burden" against Scott, given his financial condition.

Section 271 permits a trial court to impose an award of attorney fees and costs as a sanction where a party's conduct "frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a); *Featherstone v. Martinez* (2022) 86 Cal.App.5th 775, 783.)

16

An award of attorney fees may be imposed under section 271 only after notice and an opportunity to be heard is provided to the party against whom the sanction is proposed. (§ 271, subd. (b).) Courts may not award a sanction that "imposes an unreasonable financial burden" on the sanctioned party. (*Id.*, subd. (a).) We review such awards for abuse of discretion. (*Featherstone*, at pp. 783–784.)

On appeal, Scott has dropped his contention below that the attorney fee award incorrectly included hours expended in different proceedings. Instead, he advances the following three grounds for reversing the award: (1) the award was dependent upon the court's erroneous denial of his modification motion; (2) the court was powerless to award section 271 sanctions because Kikianne disclaimed reliance on that statute in favor of other bases for attorney fees; and (3) the court lacked sufficient evidence to impose section 271 fees because counsel for Kikianne submitted a conclusory declaration that did not set forth his hours, hourly rates, or a description of his services. We are not persuaded.

We may quickly dispose of the first two grounds. First, we have determined that the trial court's order was not erroneous. Second, as a factual matter, Kikianne's trial brief expressly sought the same attorney fees under sections 271, 2030, 2032, and 3557, and she never disclaimed reliance on section 271. Though her closing brief requested a hearing on section 271 sanctions, her trial and closing briefs explicitly requested the same attorney fees under all four statutes. Notwithstanding his contention that the requested hearing would have provided him due notice and a full opportunity to be heard on the matter, Scott does not claim he was actually deprived of due notice and an opportunity to be heard. Indeed, each party requested section 271 attorney fees against the other, and Scott's briefs did in fact

17

argue that his conduct did not warrant sanctions but that Kikianne's conduct did. At the long cause hearing on Scott's modification request, neither Kikianne nor Scott disputed the trial court's statement that attorney fees were at issue. On this record, we conclude that Kikianne did not disclaim reliance on section 271 and that Scott had ample notice and opportunity to oppose such sanctions.

Scott's final complaint is that counsel for Kikianne did not provide sufficient information to support the trial court's award of $123,909. This, too, is unavailing.

Contrary to Scott's suggestion, *In re Marriage of Duris & Urbany* (2011) 193 Cal.App.4th 510 (*Duris*) does not compel a reversal of the fee award. In that case, the trial court held a scheduled hearing on the appellant's motion to modify child support, in which the appellant appeared in propria persona. (*Id.* at p. 512.) Without previous notice having been given, the court raised sua sponte the issue that the appellant's former counsel had unnecessarily filed an earlier discovery motion. (*Id.* at pp. 512, 514.) The court summarily imposed sanctions at the hearing, even though the unrepresented appellant "had no opportunity to subpoena [her former counsel] to explain the reasons for filing the discovery motion" (*id.* at p. 514) and even though the respondent's counsel had filed no declaration setting forth his hours, hourly rate, a description of his services or what the respondent paid as fees (*id.* at p. 515). Because the appellant was precluded from presenting evidence challenging the basis for the sanctions and the reasonableness of the respondent's counsel's fees and hourly rates, *Duris* held the award was "not consistent with due process procedural protections." (*Ibid.*)

18

The situation here stands in sharp contrast. Scott was an attorney who had counsel representation, and he knew from Kikianne's trial brief that she was seeking $123,909 in attorney fees under sections 271, 2030, 2032, and 3557. Kikianne's brief explained the requested amount included fees for counsel's time in defending against Scott's modification request and for pursuing her child support and breach of fiduciary duty claims. She also elaborated that she and her counsel had been forced to deal with 55 special interrogatories and over 50 document production demands propounded by Scott and that 14 hours were spent preparing for and attending her deposition. Additionally, her counsel had to respond to Scott's motions to quash trial subpoenas, file motions to join SCA in the action, and engage in "many other legal maneuvers . . . due to Scott's overly litigious nature." To support Kikianne's attorney fee request, her counsel submitted a declaration with Kikianne's closing brief stating that Kikianne had "incurred a total of $125,456" in attorney fees for defending against Scott's request for modification of spousal and child support ($68,288.30) and for pursuing her breach of fiduciary duty claim ($57,168). Thus, unlike the situation in *Duris*, the trial court's award is supported by an attorney declaration specifying both the fee amount and the matters for which fees had been incurred.

Though additional information regarding counsel's hours and billing rate could and should have been provided, Scott had every opportunity and incentive to raise that issue in his trial briefing and at the long cause hearing, but he did not do so. Indeed, Scott himself sought section 271 sanctions of $75,000 in his closing brief to compensate him for the fees and costs he incurred only on the modification matter. That sum exceeded the $68,288.30 that Kikianne requested for her counsel's services in opposing modification. Because Scott could have challenged the lack of billing details

19

supporting Kikianne's $123,909 request but did not, and because there was no question the course of litigation was protracted, with numerous motions, cross-motions, and oppositions filed throughout, the trial court could properly have determined the requested fees were reasonable in amount.

For all the foregoing reasons, we see no basis for reversing the attorney fee award.

### DISPOSITION

The judgment is affirmed. Costs of appeal are awarded to respondent Kikianne Cole.

_____
Fujisaki, J.


WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.


*Cole v. Cole* (A163975)

Trial Court:         Contra Costa County Superior Court

Trial Judge:         Hon. Benjamin T. Reyes

Counsel:             Katz Appellate Law, Paul Katz for Plaintiff and Appellant

                     Law Offices of Martin Glickfeld, Martin Glickfeld; Siefert,
                         Murken, Despina, James H. Nathan for Petitioner and
                         Respondent