[No. G039234. Fourth Dist., Div. Three. Jan. 29, 2009.]

In re the Marriage of MARC and RACHAEL S. BERGER.
MARC BERGER, Respondent, v.
RACHAEL S. BERGER, Appellant.

COUNSEL

Law Offices of Marjorie G. Fuller and Marjorie G. Fuller for Appellant.

Law Offices of Steven E. Briggs and Steven E. Briggs for Respondent.

OPINION

**BEDSWORTH, Acting P. J.**—In this case, we are called upon to reiterate that while divorced parents have the same right to pursue happiness as all other citizens, they cannot do so by abrogating their obligation to support their families. And they certainly cannot do so by voluntarily deferring salary, living extravagantly off their sizeable assets, and pleading poverty at the support hearing.

Rachael S. Berger appeals from the judgment in this action dissolving her marriage to Marc Berger. She contends the court erred in denying her spousal support; awarding her only $1,115 in monthly child support for the couple's two daughters; and denying her request for an award of attorney fees. Rachael[1] points out that during the couple's marriage, they enjoyed a high standard of living based upon Marc's earnings in the financial industry. Just before they separated, Marc chose to leave that profession and devote his full-time labor to the startup of a business offering financed landscaping to developers of new homes. In the three years prior to trial, Marc agreed to defer most, and then virtually all, of his income from the business—which is apparently in dire financial straits—while continuing to live a wealthy lifestyle. By his own admission, Marc's expenses exceed $21,000 per month.

In essence, Rachael makes two arguments regarding support. First, she asserts the court abused its discretion in refusing to impute income to Marc, based upon his ability to resume earning income at the levels he had *before* voluntarily departing the world of finance. We are not convinced the evidence in this case was strong enough to compel such a conclusion. But her second argument is compelling. Rachael contends Marc's voluntary decision to continue dedicating his efforts and services to the company under an agreement by which it distributes almost none of his income to him, but instead accrues it on the company books—a decision that is made possible by

---

[1] Because the parties share the same last name, we refer to them by their first names for the sake of clarity only. No disrespect is intended.

Marc's ability to tap into his other substantial assets for his own support in the interim—should not be viewed as a justification for reducing his obligation to pay support. She maintains the trial court should have either treated Marc as though he were *receiving* the income to which he is entitled on a current basis, or as a "special circumstance," which warrants a departure from the guideline amount of child support.

We agree with this second argument. While it would be improper to impute to Marc the income he had formerly earned in the finance industry in the absence of evidence demonstrating he could *still* earn such an income if he were to return to that industry today, there is evidence of his present earning capacity *outside* that industry. It is provided by Marc's agreement with his present employer, and is unaffected by his voluntary agreement to defer those earnings. In essence, Marc's company is providing the proof of his ability to earn in the form of the salary it is accruing for him. The fact he is choosing to plow that salary back into the company cannot be spun into a basis for ignoring those earnings.

In effect, Marc is simply choosing to *invest* his salary each month back into the company, while supporting his own lifestyle with other assets. For purposes of calculating support, that decision is indistinguishable from one in which Marc actually did receive the salary, utilized it for his living expenses, and then used his *other assets* to invest in the company. For purposes of calculating support, it cannot make a difference whether Mark is paying his bills from his salary and leaving his savings untouched, or paying them from his savings and "banking" his salary.

Because the court erred in failing to recognize that Marc's income should be measured by the earnings he has chosen to give back to his company—or at least to characterize his decision to do so as a "special circumstance," which warrants a departure from the guideline support amounts—we reverse its rulings on the issues of child support and spousal support, and remand the case for further proceedings on those issues.

With respect to the issue of attorney fees, we note that the court's own ruling stated that it would "reserve jurisdiction to make a fee award if appropriate" in the event Marc received some or all of the income he agreed to defer. In light of our determination that Marc must be treated as though he *is* receiving that income, we conclude the fee issue must be reconsidered as well.

## FACTS

Marc and Rachael were married in 1991, and separated in November of 2002. They have two daughters, born in 1992 and 1994. After the birth of the

second daughter, Rachael became a stay-at-home mother. Marc petitioned for divorce in December of 2003.

The parties obtained a judgment terminating their marital status in October of 2004. Pending resolution of the remaining issues in dispute, Marc was ordered to pay Rachael $4,000 per month in spousal support, and $3,500 in child support for both daughters. The family residence was sold in mid-2005, and the proceeds, totaling in excess of $2 million, were divided between the parties.

In 2001, prior to the parties' separation, Marc voluntarily left his employment as a partner at PricewaterhouseCoopers, where he had earned as much as $600,000 per year, to devote his full-time efforts to the job of president and chief executive officer of a landscape business, X-Scapes, in which he also owned an equity interest. The concept behind X-Scapes, which had commenced operations "on a limited basis" earlier in 2001, was that it would offer landscaping, on a financed basis, to developers of new homes, who could, in turn, offer that landscaping as one of the options available to the ultimate home purchasers.

Marc devised the business plan for X-Scapes, which was initially capitalized with $1 million in cash contributed by other investors—although Marc was credited with an additional $500,000 in "sweat equity" for his efforts in establishing the business. X-Scapes was able to pay Marc a salary of approximately $200,000 in 2002, $175,000 in 2003 and $215,000 in 2004. However, apparently those salaries had been funded by the initial capitalization of, and subsequent capital infusions to, the company, rather than from any profits. In fact, from its inception, X-Scapes has never generated a profit. In 2004, Marc and other X-Scapes principals guaranteed certain loans to the company, and Marc himself loaned it $250,000.

Because of financial difficulties experienced by X-Scapes, Marc and the other officers entered into "a series of amendments to their respective employment agreements . . . call[ing] for salary reductions and deferment of income." Ultimately, in October of 2005, Marc filed an order to show cause for modification of his temporary support obligation, alleging that due to his agreed-upon salary deferral at X-Scapes, he could no longer afford to pay temporary support at the levels set by the court.

In February of 2006, the parties stipulated to a suspension of Marc's temporary support obligation beginning in December of 2005, without prejudice to the court reinstating that support obligation, retroactively, at the time of trial. The parties also stipulated that the daughters would reside primarily with Rachael, but would spend Wednesdays and alternate weekends with Marc.

The trial commenced in April of 2006. In connection with that trial, Marc reported on his income and expense declaration that his income "varies," and his personal expenses were $21,372 per month. However, that expense number included $5,600 for "divorce legal accounting," which is presumably temporary, and a $5,206 payment for the mortgage on a "[l]ot held for construction of primary residence."[2]

Rachael, who has only a high school education, reported that she was employed as a part-time administrator for a financial firm, and was working 15 to 20 hours per week for $15 per hour. She reported household expenses of $17,749 per month, including approximately $2,500 in expenses pertaining exclusively to the daughters (such as children's clothing, childcare, lessons, etc.).

Marc testified at trial that X-Scapes had been paying him an income of $2,000 per month since sometime in 2005—an amount calculated to cover his obligation to fund health and dental insurance for himself, Rachael and their daughters. Marc acknowledged that "theoretically," X-Scapes was accruing liability to him for the period in which he had not been paid any significant salary, but that he expected any such liability would ultimately be "converted to some type of equity ownership" in the company, rather than a cash payment, to preserve whatever capital the company might have. As Marc explained it, "equity capital is hard to find for a business like this and you're not going to be paying out—no investor is going to want you to pay out new capital for salaries." Marc agreed that his total "deferred" salary—defined as the difference between the compensation his employment contract had specified he was entitled to receive, and the compensation he had actually received—was as high as $350,000 by the time trial commenced.

Marc also acknowledged he had no expectation "as to when the company will be paying [him] a salary greater than $2,000 per month," However, despite his lack of significant current income, Marc stated he had approximately $800,000 in cash at the time trial commenced, left over from the division of the parties' community assets. He also acknowledged that he had taken out a $1.8 million loan in early 2006, for the purchase of a lot in Laguna Beach and the construction of a home thereon. By the time trial

---

[2] According to Marc's expense declaration, he took out a construction loan with a face amount of $1,849,200, and had applied approximately $680,650 of that loan toward the purchase of a $950,000 lot in Laguna Beach. A "remaining balance of approximately $1,168,549.00 remains to be drawn" on the loan for construction of a home on that lot, and the "monthly payments will increase as [the] loan is drawn down."

began, the lot had already been purchased, and Marc intended to use the balance of his loan for the anticipated construction of his primary residence.[3]

Marc explained that in the absence of any significant cash salary coming to him from X-Scapes, he was meeting current expenses by utilizing his cash assets. He stated that he was choosing to stay with X-Scapes, despite its inability to pay his current salary, because of the loan guarantees he had made, and his belief that if X-Scapes failed, those loan obligations would force him into bankruptcy.

The trial occupied four days, stretched over six months. By the last time Marc testified, in September of 2006, he was claiming to have only $430,000 to $450,000 in liquid assets, down from the $800,000 he had testified to at the beginning of trial.[4] Marc also estimated he had equity of $500,000 in his Laguna Beach lot.

Although the trial ended in October of 2006, the court did not issue its final statement of decision until April of 2007. In that statement of decision, the court noted that "[f]or the last two years, [Marc] has worked 80 hours per week and has received very little by way of monetary compensation. . . . [¶] [Rachael] has said, enough is enough! She bellows that refrain made popular by the country singer/songwriter Kenny Rogers, 'you've got to know when to hold 'em and know when to fold 'em.' She says it is time to fold 'em and return to the work that commanded the level of compensation that established the marital standard of living this marriage achieved. [¶] The appeal of this perspective is easy to embrace. Children are our first priority. A parent's dreams and/or ambitions should ride shotgun to the needs of their children.

---

[3] As Rachael points out, the application for Marc's construction loan reflected that his claimed income was *$65,000 per month*. However, Marc testified that he had not read the application carefully, because it was merely a document presented to him at the time of the loan's closing, and it had not been relied upon in making the loan. He expressly denied that the income reflected on the application was accurate, and the court expressly believed him. Of course, we cannot compel the court to be persuaded by evidence it finds unpersuasive, and the loan application falls into that category. In the absence of any other evidence Marc was actually receiving that much income from some source, the court was not obligated to believe the numbers on that form. We consequently reject Rachael's assertion that the loan application compels a different result in this case.

[4] It is not clear what caused the precipitous drop. In August of 2006, Marc claimed to have $500,000 in deposit accounts, which is quite a plunge from the original estimate of $800,000 he had given only four months earlier. How it then dropped yet another $50,000 to $70,000 in the following month is also unexplained. Accepting Marc's contention that his monthly expenses were $21,000, his total assets should have been depleted by only about $105,000, between April and September of 2006, even assuming he was receiving no income at all. According to the attorney who has represented Marc from the commencement of this proceeding, Marc had incurred fees and costs of approximately $125,000, up to September of 2006. So that certainly does not explain it.

The question then is how long should the Court sanction [Marc's] grip on the business? At some point, it does become prudent to move on, doing what is necessary not to leave behind a mess. It appears that time may have arrived." (Italics & underscoring omitted.)

The court concluded, however, that "there was insufficient evidence" demonstrating Marc had any current "opportunity" to earn the level of salary he once had while working in finance. It thus declined to impute that salary to him "for the calculation of support and fees." It also declined to order him to pursue other opportunities. Instead, the court merely required Marc to "report on a quarterly basis . . . the financial circumstances of X-Scapes, and any job searches undertaken."

The court also concluded Marc "derives no income from the business known as X-Scapes other than the $2,000 monthly amount necessary to pay the insurance needs of the family," while at the same time finding that he had accrued "somewhere around $350,000 in deferred income." The court expressly reserved jurisdiction over that deferred salary, plus any "loans or monies of any kind or description" which Marc may receive in the future from X-Scapes, "both as to characterization and as a source for support and fees."

The court then imputed income of $3,168 to Marc, based upon a theoretical return of 4.5 percent on assets.[5] For Marc, those assets included both the $450,000 in cash the court estimated he had remaining in deposit accounts, plus the $500,000 Marc had estimated as his equity in the Laguna Beach lot. After combining that imputed income with the $2,000 in monthly salary Marc was receiving from X-Scapes, the court calculated that Marc should pay a combined total of $1,115 in monthly support for his two daughters, and no spousal support.

The court also declined to order Marc to pay any portion of Rachael's fees. The court noted that both parties' attorney fees seemed reasonable, and explained that both parties "have a comparable amount of cash . . . [and] a comparable level of income." The court reasoned that "[d]uring the pendency of this action, the support paid resulted in each party having equal access to legal counsel [and] [n]either party owes any considerable sums to their representative." It consequently determined that "each party shall bear their own fees and costs without contribution from the other party. However, should [Marc] receive some or all of the deferred income as described above, the Court reserves its jurisdiction to make a fee award if appropriate."

---

[5] The court also imputed income of $1,875 to Rachael, based upon the same theoretical 4.5 percent return on her $500,000 in remaining cash.

## I

Rachael first argues the court erred in failing to impute income to Marc at a rate equivalent to what he had earned in 2001, when he was still employed by PricewaterhouseCoopers. We begin with the proposition that a support order is reviewed for an abuse of discretion. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282 [111 Cal.Rptr.2d 755].) Thus, we consider only "whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." (*In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1360 [119 Cal.Rptr.2d 430].) As explained in *In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 753 [57 Cal.Rptr.3d 274], "[w]e do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order."

■ With that in mind we conclude Rachael's argument is not persuasive. As Marc points out, and the trial court specifically reasoned in its decision, income cannot be imputed based upon a party's earning "capacity" absent proof of *both* ability and opportunity to earn the income on a going-forward basis. As this court recently explained in *In re Marriage of Bardzik* (2008) 165 Cal.App.4th 1291 [83 Cal.Rptr.3d 72], the burden of proof for imputation of income cannot be met by evidence establishing merely that a spouse continues to possesses the skills and qualifications that had made it possible to earn a certain salary in the past—even where it was undisputed that the spouse had voluntarily left that prior position.

In *Bardzik*, the wife had voluntarily chosen to retire early from her job as a deputy sheriff, at the age of 42. However, the fact she was still quite young, with a proven track record of past earning capacity that she had voluntarily relinquished, was simply insufficient to demonstrate she would actually have the *opportunity* to earn at that prior level on a going-forward basis—or assuming she would not, to demonstrate the level at which she might be able to earn.

This case is similar. Although it is undisputed that Marc voluntarily abandoned his prior employment with PricewaterhouseCoopers in 2001, and that he had earned a very substantial salary while in that employ, Rachael points to absolutely no evidence suggesting, let alone demonstrating beyond dispute, that he could have resumed that work in 2006, at his prior salary, even had he wished to do so. It is possible, certainly, that Marc's particular skills and experience would make it likely that he could earn similar sums in the future, but that probability must be *evidenced*, not merely suspected.

There was no such evidence here. Moreover, *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375 [82 Cal.Rptr.3d 497], which Rachael cites in

her reply brief, is of no assistance to her. In *Mosley*, the wife had a law degree from a prestigious school, where she had served as editor of the law review, and had worked for a very prestigious law firm prior to choosing to devote her full-time efforts to raising the couple's children. As of the time the parties divorced, she had not practiced law in nearly a decade.

The court nonetheless concluded it was proper to impute income to her based upon her earning capacity. But the court did not decide it was proper to impute earnings based upon the mere fact the wife had *once* earned an income. Instead, what the court found to be sufficient was expert opinion evidence addressing the specific issue of her capacity to earn income *in the future*: As the court noted, "Paul provided a vocational evaluation summary demonstrating that Dawn had a substantial earning capacity. He also provided the testimony of the vocational expert who had prepared the summary, and who had interviewed Dawn as part of the evaluation process. The vocational expert testified that Dawn, as an attorney, had an approximate earning capacity of $95,000 per year to start, although it might take her about 26 weeks to find a position. He also testified that Dawn could earn $16 to $20 per hour as a paralegal." (*In re Marriage of Mosley, supra*, 165 Cal.App.4th at p. 1391.) That type of evidence, demonstrating an analysis of the spouse's qualifications, as well as the opportunities currently available in the job market, is a far cry from evidence merely establishing that the spouse had once earned a certain salary, and thus presumably could again—which is the only evidence Rachael presented to the trial court here, in her effort to demonstrate Marc's theoretical earning capacity in the world of finance.

Because there was no evidence demonstrating that Marc would even have employment available to him if he decided to return to the type of work he had done prior to X-Scapes, let alone what that employment would likely pay, we cannot say the court erred in refusing to impute income to him based upon that theoretical employment.

## II

We next consider whether it was error to reject the conclusion Marc's income—or at least his present earning capacity—is established by the salary he was contractually entitled to receive from X-Scapes, but has agreed to defer as part of the effort to maintain the capital of that company.

At first blush, we can certainly understand the decision reached by the trial court. Marc is apparently a highly successful man who has poured his heart—and much of his wealth—into a dream business, and now finds himself in stormy seas. The business has never turned a profit, and while Marc is receiving essentially no income on a current basis, he is also in some

danger of losing everything if forced to walk away. We will assume, as the trial court did, that Marc is acting in good faith, and is doing what he thinks is best in very difficult circumstances.

■ Nonetheless, we conclude the court abused its discretion in deciding those circumstances warranted an order that essentially granted Marc a "holiday" from any significant responsibility to support his family at the present time. Family Code section 4053 sets forth certain principles to be adhered to in implementing the uniform guidelines for establishing child support. They include: that "[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life," that "[b]oth parents are mutually responsible for the support of their children," and that "[e]ach parent should pay for the support of the children according to his or her ability." (Fam. Code, § 4053, subds. (a), (b), (d).)

■ With those principles in mind, it is clear to us the court erred by failing to interpret Marc's current *voluntary* employment situation as demonstrating either (1) actual earnings equivalent to the X-Scapes salary he has elected to "defer"; or (2) "special circumstances" warranting a departure from guideline amounts, in an amount that would elevate Marc's support payments to the amount he would have been ordered to pay if he were actually receiving his X-Scapes salary.

We begin with the proposition that Marc has entered into an employment agreement with X-Scapes, by which his services as president and chief executive officer were assessed to be worth compensation of approximately $200,000 per year, maybe more. There is no evidence that anybody ever concluded Marc's services were no longer worth that amount—instead, the only evidence suggests merely that the company lacked sufficient capital to make it prudent to continue distributing Marc's salary on a current basis.

Thereafter, as the trial court found, Marc entered into a series of amendments to his X-Scapes employment contract, by which he voluntarily *agreed* to decrease his salary below the amounts originally called for in the contract, and then ultimately to "defer" his receipt of that salary. As a result of those amendments, the court found that Marc's company had actually accrued some $350,000 in salary liability to him by the time of trial.

According to his own testimony, Marc agreed to those reductions and deferrals because he had determined it was in his own financial best interest to do so. Marc explained that he believed a further depletion in the company's capital, caused by the continued outlay of salaries to him and the other officers, would harm X-Scapes's ability to raise further capital in the future,

and thus imperil its viability. As a part owner of X-Scapes (at least 25 percent, although Marc was vague about specifics, explaining that his owner-ship interest had evolved over time), as well as a guarantor of substantial loans to the company, Marc believed that he stood to lose substantial assets if the company did not survive—an outcome which he also believed was likely to occur if he departed.

Marc had thus concluded it was in his own long-term financial interest to remain with the company on that "salary deferred" basis. Based upon that calculation, then, what Marc did was *bargain* away his right to receive his salary on a current basis. He made a deal with X-Scapes that he would defer most of his salary. Certainly, X-Scapes could not have forced him to stay in its employ if it was no longer willing—or able—to pay him the salary called for in his contract. In the absence of Marc's *agreement*, either the company would have been forced to continue paying him, until it *actually did* run out of capital, or he would have long since chosen to work elsewhere—for a salary.

By agreeing to defer his salary to preserve his company's capital, Marc is, in effect, investing in the company. He's agreeing to take no income now, with the expectation that if the company's fortunes later improve, he will be compensated with additional equity. And he is funding that choice by relying upon his other assets to support his living expenses. But Marc could have just as easily chosen to retain his salary—which after all, he needs to support himself—*and his family*—and instead utilize his *other assets* to fund monthly capital investments into his company. Except for obvious tax benefits associ-ated with forgoing "income," it amounts to essentially the same thing: Marc has chosen to increase his investment in X-Scapes every month, while depleting his other assets in a corresponding amount.

But of course, there is one other obvious benefit to this option: by agreeing to "defer" his salary as a means of shoring up the company's capital, rather than collecting that salary and utilizing his other assets to shore up the company's capital, Marc is able to claim only minimal current earnings, and thus minimal ability to pay current support. The money he saves in support payments can then be dedicated to either shoring up the company, or to meeting Marc's own rather significant living expenses.

■ We conclude Marc cannot unilaterally, and voluntarily, arrange his business affairs in such a way as to effectively preclude his children from sharing in the benefits of his *current* standard of living. *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331 [66 Cal.Rptr.2d 393], is instructive in this regard. As that case explains "[a] parent does not ' " 'have the right to divest himself of his earning ability at the expense of . . . minor

children.' " ' [Citation.]" Thus, when a parent voluntarily chooses not to maximize his income, "the court must retain discretion to impute income"; if it does not, " 'one parent by a unilateral decision could eliminate his or her own responsibility to contribute to the support of the child[ren], causing the entire burden of supporting the child[ren] to fall upon the . . . employed parent.' [Citation.]" (*Id.* at p. 1339.)

In this case, we need "impute" nothing. Marc has an established salary level for his current services at X-Scapes. He has simply chosen to, in the words of *LaBass & Munsee*, "divest himself" of those earnings for reasons unrelated to his family or their needs. Having made that choice, Marc must bear its consequences—all of them. Just as he has continued to meet his other expenses during his period of voluntary salary deferral, Mark must likewise continue meeting his support obligations. That additional factor is simply another aspect of the financial calculation Marc must engage in to determine how long he wishes to remain with X-Scapes.

Further, the fact that Marc may have felt himself under some financial pressure (because of his prior investments in X-Scapes and loans he guaranteed on its behalf) to continue supporting the company with his salary, does not alter the voluntary nature of his decision. Nobody forced Marc into this situation. Just as nobody forced him to spend nearly a million dollars on unimproved property in Laguna Beach. In essence, what Marc has done is simply weigh the potentially detrimental impact that his leaving the company might have on his long-term financial interests, against the short-term benefit of collecting his salary. Based upon that calculation, Marc has chosen to relinquish his current ability to collect that salary, and thus—he believes—the bulk of his obligation to support his family. His belief in that latter regard, however, is ill founded: his support obligations are not ones which Marc is free to relinquish.

In short, we conclude that in the circumstances of this case, Marc must be treated as currently *earning* his X-Scapes salary; and his voluntary choice to forgo receipt of that salary changes nothing for purposes of including it in his "income" for purposes of establishing support obligations.

But even if we agreed that Marc's decision to forgo *receipt* of his salary might have precluded the trial court from characterizing it as income for purposes of support, we would still conclude the court erred in not recognizing that this situation demonstrates "special circumstances" which warrant a departure from the guideline amount of support awarded in this case.

As set forth in Family Code section 4057, while the amount of support established by applying the statutory formula is presumptively correct, the court may depart from that formula under several circumstances,

including those situations when "[a]pplication of the formula would be unjust or inappropriate due to special circumstances in the particular case. These special circumstances include, *but are not limited to*, the following: [¶] (A) Cases in which the parents have different time-sharing arrangements for different children. [¶] (B) Cases in which both parents have substantially equal time-sharing of the children and one parent has a much lower or higher percentage of income used for housing than the other parent. [¶] (C) Cases in which the children have special medical or other needs that could require child support that would be greater than the formula amount." (Fam. Code, § 4057, subd. (b)(5), italics added.)

In this case, "special circumstances" are established by the fact that Marc has voluntarily agreed to continue working for an employer which is no longer providing him with a current salary—a choice he can afford to make only because he has substantial *other wealth* to utilize for his expenses in the interim. Marc's ability to tap into those other assets—the very same assets he believes would be placed at risk if X-Scapes fails—is the reason he can afford to keep living like a man who is *actually receiving* an income of over $250,000 per year—*after taxes.*[6] Clearly, Marc has not viewed the deferral of his X-Scapes income as any justification for curtailing *his own* current lifestyle.

It is thus only fair to apply the same judgment to Marc's support obligations. Otherwise, we would be implicitly agreeing that Marc should be allowed to forgo any measurable income, and thus any significant support obligation, until he has finally depleted his other assets—supporting himself only—to the point where he realizes he actually needs some other income to continue maintaining his lifestyle. Only then, with no other assets left to protect (or live off of), will Marc have any real incentive to walk away from X-Scapes and start earning some significant cash income. In the meantime, his family gets virtually nothing. That is not what the law envisions.

"Assets at the time of dissolution . . . may enter indirectly into the [child support] calculation in two ways: (1) In assessing earning capacity, a trial court may take into account the earnings from invested assets (see, e.g., *In re Marriage of Cheriton*[, *supra*,] 92 Cal.App.4th [at p.] 292 . . .); and (2) a court may deem assets a 'special circumstance' (Fam. Code, § 4057, subd. (b)(5)) that may justify a departure from the guideline figure for support payments (*In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 332 [112 Cal.Rptr.2d 893])." (*Mejia v. Reed* (2003) 31 Cal.4th 657, 671 [3 Cal.Rptr.3d 390, 74 P.3d 166].)

---

[6] $21,000 per month, multiplied by 12 months, equals $252,000 per year. Marc would have to earn a *gross* income of substantially more than that to actually afford these monthly expenses.

So even if the court were not required to treat Marc's deferred salary as income, we think the circumstances before us would clearly call for application of that "special circumstances" assets rule. To do otherwise would be tantamount to permitting Marc to avoid paying support *because he is wealthy*. As we have already noted, it is actually Marc's wealth which permits him to continue on his current course; a man with less resources would have been forced to get another job—and to pay support based upon the earnings from that job—long ago. If Marc were merely an employee of X-Scapes, earning $200,000 per year, but without any equity in the company to protect, and no other cash assets to live on, it seems clear he could not have elected to remain with the company for any significant period of time after it had stopped distributing his salary.

It would be ironic indeed if we allowed the fact that Marc does not need a job to support himself in the short term—as a less wealthy man would—to be spun into the justification for granting him a break from the obligation to support his family. Whatever the merits of Marc's decision to continue devoting his efforts to X-Scapes—merits which we do not judge—the wealth which gives him the freedom to make that decision cannot be used as a basis to avoid support.

We do not criticize Marc's business strategies; for all we know, his decision to continue with X-Scapes, rather than devoting his labor to some other income-producing opportunity, will ultimately prove to have been a wise one. But we cannot allow Marc to choose unilaterally to trade his family's right to receive current support in accordance with his abilities, for a chance at realizing that future return. On remand, the court must recalculate Marc's support obligations at a level commensurate with the earnings he has voluntarily chosen to forgo in pursuit of his X-Scapes dream.

## III

Finally, in light of our conclusion that Marc must be treated, for purposes of support, as though he were actually receiving the X-Scapes income to which he was originally entitled, we also must reverse the court's order decreeing that each party should "bear their own fees and costs without contribution from the other party." In that order, the court also specifically stated that "should [Marc] receive some or all of the deferred income" from X-Scapes, it would consider making a fee award to Rachael. Our conclusion is that Marc's nonreceipt of that income, which was entirely voluntary on his part, cannot be used as a basis to reduce the financial obligations he would otherwise be subject to. Consequently, we direct the trial court, on remand, to reconsider that fee order, treating Marc as though he has actually received that income.

The judgment is reversed, and the case is remanded for the limited purpose of reconsidering the court's awards of child support, spousal support, and attorney fees. Rachael is to recover her costs on appeal.

Aronson, J., and Ikola, J., concurred.

A petition for a rehearing was denied February 27, 2009.