Filed 12/8/22  O.E. v. John G. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| O.E., | B310605 |
| Respondent | Los Angeles County |
| v. | Super. Ct. No. 17STPT00073 |
| John G., | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael J. Convey, Judge.  Affirmed.

John G., in pro. per., for Appellant.

O.E., in pro. per., for Respondent.

_____

In this family law case, a father, John G., appeals rulings on parenting time, child support, and sanctions.  We affirm.

Undesignated statutory citations are to the Family Code.

I

The father and O.E., the mother, have a daughter, A.E.G., who was born in December 2016.  The parents were in a relationship between April 2015 until shortly after A.E.G.'s birth.  A.E.G. has lived with the mother since birth.  The father lives about 45 miles away.

Before trial, in May 2018, the court ordered the father to appear for a vocational exam.

Trial proceeded in two phases.  Phase one was about custody and parenting time.  It lasted four days in December 2018.  Phase two was about child support and sanctions.  It lasted three days in July 2020.

Before phase one, the father had A.E.G. for two hours on Wednesdays and three hours on Saturdays.

The father asked the court for equal parenting time.  After one month of transition, he wanted parenting time from 8:00 a.m. Sundays until 8:00 p.m. Wednesdays.

The mother requested the father have parenting time weekly on two weekday afternoons and every other Saturday.  After A.E.G. turned four, the mother asked for the father to have overnights each Friday.

The father alleged the mother kicked him and this issue came up during both phases of trial.  In phase one, he said the mother kicked him in May 2017 and this caused a bruise.  He said, "[S]he kicked me very hard."  He played a video of the incident when cross-examining the mother.  The mother

submitted that video as evidence, but she did not play it at trial. The father also presented photographs of his arm with a bruise.

The court made factual findings. It distrusted some of the father's evidence. As to the father's contention that the mother kicked him, the court did not credit the father. The court found the video showed the mother and father slightly brushed together and the father had an exaggerated and dramatic reaction.

The court found both parents sometimes acted inappropriately to try to gain a litigation advantage, but the court identified more examples of the father's disingenuous conduct. The court found the father used written communications with the mother to manufacture issues. The father documented A.E.G.'s occasional bumps and bruises as evidence of abuse by the mother. The court found A.E.G.'s minor injuries were typical of a toddler. The father made repeated and unfounded statements about the mother abducting A.E.G. The father used a scanner to search A.E.G.'s body for recording devices he thought the mother planted. These searches were fruitless.

The court found the mother testified credibly that the father once pushed her in the chest, she fell backwards and lost her balance, and this happened around A.E.G.

The court ordered joint legal custody and largely granted the mother's requests for parenting time. A.E.G. would live primarily with the mother. The father would have parenting time on Mondays for three hours, Wednesdays for seven hours, and three Saturdays a month for ten hours each. On January 1, 2021, after A.E.G. turned four, the father would have overnights every Friday at 3:00 p.m. to Saturday at 6:00 p.m.

The court explained its reasoning. A.E.G. had lived with the mother since birth. A.E.G.'s daycare and doctor are near the mother. The mother was A.E.G.'s primary contact and primary bond. Given her stage of development, the court found A.E.G. should maintain this primary bond in the mother's home.

The court rejected the father's request for three and one-half days of consecutive parenting time per week because it did not prioritize A.E.G.'s needs. His plan would keep A.E.G. from her primary attachment for extended overnight periods at an early stage. It would be detrimental for A.E.G. to be apart from either parent for long periods of time. Other obstacles to having equal time were the distance between the parents, which would make it difficult for A.E.G. to go back and forth more often, and the parents' high-conflict communication.

The court gave the mother final decisionmaking authority if the parents had an impasse. The court explained the mother's decisions were more child centered. The father's decisions were sometimes based on what he wanted and about opposing the mother, not about A.E.G.'s best interests.

The second phase of trial was about child support and sanctions. Before this phase, the father paid $88 per month in child support.

The father was born in 1969. He has a bachelor's degree in economics. He has worked for about 20 years as a caregiver to his disabled sister for $589 a month. The sister lives separately from the father. He mostly cares for her from his own home. The father said this work takes approximately 32 hours a week and it is not on a fixed schedule. The father makes online purchases, does wellness checks, and takes his sister to appointments.

4

The father said his assets included about $180,000 from two accident settlements and $30,000 in real and personal property. He lives with his mother and does not pay rent.

The expert who conducted the vocational exam testified. On May 14, 2018, the expert met with the father. On May 31, 2018, the father received the expert's report, which found the father had the ability and opportunity to earn and listed potential jobs and positions.

The expert's report said the father characterized himself as "computer literate." The father "knows the keyboard" and uses Microsoft Word, email, and the internet.

The vocational expert testified the father has an earning capacity of $37,000 per year as an administrative assistant. The expert identified four potential positions in this field based on updated research from a day or two before the testimony.

The father thought the court should disregard the expert because the father was not interested in being an administrative assistant, he lacked experience, and the expert did not "guarantee" him a position.

The father told the expert he had injuries that prevented him from performing some types of work. The father did not provide corroborating evidence about his assertion. The expert did not opine about whether the father was too injured to work full time, but he explained that if this were true, the father would qualify for social security disability benefits. The father could separately earn up to about $14,000 in income and remain eligible for those benefits.

The father did not offer documentary evidence that he was unfit to work. As of phase two, the father had not applied for

social security disability benefits despite receiving the vocational report that discussed these benefits.

The mother and father offered competing testimony about sanctions. The mother said she asked the father to pick up A.E.G. from daycare for his Monday and Wednesday parenting time so the mother would not lose time at work. The mother offered compromises, including giving the father extra parenting time or doing the pick-up at a grocery store, but the father refused. The mother incurred attorney fees to resolve this issue. The mother testified that "[s]everal times" the father refused to talk directly to her and insisted he could only talk to her lawyer. The father also took extra time in phase one to litigate the issue of the mother allegedly kicking him.

The father asserted he was accommodating and the mother was uncooperative. He said he offered "heart felt proposals" to resolve the issue of the pick-up location and he "begg[ed]" the mother and her attorney to work with him to resolve the issue. He cross-examined the mother again about the alleged kicking incident. Despite the court's findings in phase one, the father continued to assert the mother kicked him. He asked the mother, "[H]ow is it sanctionable that being kicked by you puts me at fault?" The mother responded that she never kicked the father.

The court found it was in A.E.G.'s best interests to impute income to the father of $37,000 per year. The court admonished the father to seek work immediately.

The court calculated child support based on the imputed income and the percentage of time the father spent with A.E.G. The father owed $376 per month until January 2021, when he would increase his time with A.E.G. and would begin owing $112 per month.

The court imputed income for the father effective the day after phase two of trial ended, August 1, 2020. The court did not set a later date because the father made no effort to get a job even though he had received the expert's vocational report in 2018. The mother had asked for an earlier date of December 2018, but the court found this would be unfair to the father and against A.E.G.'s best interests.

The court imposed $10,000 in sanctions against the father for three actions that delayed resolution of the case and caused unnecessary expenditures. First, the father was uncooperative about changing A.E.G.'s pick-up location to her daycare. Second, the father insisted on talking to the mother's attorney instead of the mother about co-parenting issues. Third, the mother had to prepare for and contest the father's discredited claim that the mother kicked him.

## II

## A

The court's custody order was proper. On appeal, the father says it was an abuse of discretion not to grant his request for equal parenting time. This is incorrect.

When making custody orders, courts' primary concerns are children's health, safety, and welfare. (§ 3020, subd. (a).) Children should have frequent and continuing contact with both parents and parents should share child rearing responsibilities unless this is not in their children's best interests. (*Id.*, subd. (b).)

We review custody orders for an abuse of discretion. (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.)

The court did not abuse its discretion by denying the father's request for equal parenting time. The court properly

7

accounted for A.E.G.'s young age, her primary bond with her mother, and the location of A.E.G.'s daycare and doctor near the mother. The court validly considered the distance between the parents and the parents' issues with communicating. It appropriately found A.E.G. should not go three and one-half days at a time without seeing the mother.

The court's plan gave the father frequent and continuing contact. He had 20 hours of parenting time weekly across three days for most weeks until 2021, when he started having 37 hours of parenting time weekly across four days. The order gave the father ample time with A.E.G.

B

The court properly imputed income to the father.

To recap, the court imputed $37,000 in income effective the day after phase two of trial ended. The court used this imputed income to calculate child support payments of $376 per month for five months, then $112 per month based on the father's increased share of parenting time.

We review child support orders that consider a parent's earning capacity in lieu of the parent's income for an abuse of discretion. (See *In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234.)

Parents' first and principal obligation is to support their children. (§ 4053, subd. (a).)

In calculating gross income, courts may impute income by considering parents' earning capacity in lieu of their income, if this is consistent with their children's best interests. (§ 4058, subd. (b).) When deciding whether to apply earning capacity, courts may consider children's welfare, their developmental needs, and the time they spend with their parents. (*Ibid.*)

8

Earning capacity is the ability and opportunity to earn income. (*In re Marriage of Berger* (2009) 170 Cal.App.4th 1070, 1079.) Ability factors include age, qualifications, skills, education, work experience, and health. (*In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 995.) Opportunity means an employer who is willing to hire. (*Ibid.*) A court may consider a parent's earning capacity irrespective of the parent's subjective reasons not to earn income. (See *id.* at p. 998.) When the ability or the opportunity to work is lacking, earning capacity is absent and application of the standard is inappropriate. (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928–930 (*Cohn*) [child support order based on projected salary, rather than self-employment, was error, where despite training, skill, and earnest efforts to secure employment, payor spouse was unable to obtain job offer].)

The court properly imputed income.

The father has ability and opportunity. He has a bachelor's degree and basic computer skills. Yet he earns less than $10,000 a year. The vocational expert testified the father had an earning capacity of $37,000 as an administrative assistant. The expert identified potential positions in this field based on recent research. The court's imputation of income was sound.

The father's arguments against imputing income lack merit.

The father disputes his ability. He contends the expert said the father needed job training to be an administrative assistant, but this is incorrect. With our emphasis, the expert testified the father "has the ability to be an administrative assistant *now*."

The father also contests the ability element by arguing he lacks experience, lacks computer proficiency, and experiences

9

pain if he sits for too long.  The father raised these issues when he met with the vocational expert and he argued them at trial.  The expert offered contrary evidence, including the father's self-described computer literacy.  Notwithstanding the father's claimed lack of ability, the expert said the father qualified for various administrative assistant positions.  The court properly credited the expert.

The father complains he lacks the opportunity to work because the expert could not guarantee him a job.  The father misunderstands the opportunity element.  Opportunity does not require a job offer.  It requires a "substantial likelihood" that parents, with "reasonable effort," could apply their education, skills, and training to produce income.  (*Cohn*, *supra*, 65 Cal.App.4th at p. 930; see *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, 1391 [no burden to convince court opposing parent *would have* secured job had opposing parent applied]; *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1335, 1338–1339 [newspaper want ads soliciting applications from people with parent's qualifications sufficient to prove opportunity].)  The expert's opinion that the father qualified for jobs and his identification of several positions sufficed.

The father's contentions about his lack of opportunity are hypothetical and unfounded.  He never applied for work.  He did not negate evidence of opportunity.  (Cf. *Cohn*, *supra*, 65 Cal.App.4th at pp. 929–931 [parent lacked opportunity for salaried position when he applied to jobs across several counties but got zero offers].)

The father, with reasonable effort, could apply his skills to produce income.  He has the opportunity to work.

The father had fair notice the court might impute income. The court discredited the father's stated ignorance about his obligation to make diligent efforts to provide for his daughter. In May 2018, the court ordered the father to appear for a vocational exam, the father met with the vocational expert, and the father received the expert's report. The report found the father had the ability and opportunity to earn and listed potential jobs and positions. This gave the father sufficient notice. The father responded to the report with over two years of inaction. The court's decision to set the effective date of August 1, 2020, rather than an earlier date, was generous to the father.

The father cites *In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, but that case does not help him. There, a couple dissolved their 23-year marriage and the ex-husband paid the ex-wife monthly spousal support. (*Id*. at pp. 53–54.) When the ex-wife was 61 years old, the ex-husband sought to terminate support. A vocational expert said she could get a job. Two months after the ex-wife received the expert's report, the court imputed income to her, and substantially decreased support effective three weeks later. (*Id*. at pp. 54, 57.) The Court of Appeal found no error in the order, but found it was an abuse of discretion to terminate support without reasonable advance notice and an opportunity to secure employment. (*Id*. at p. 58.)

*Schmir* does not control. First, the spousal support and child support contexts are different. Parents' first and principal obligation is to support their minor children, consistent with the children's best interests. (§ 4053, subd. (a).) A.E.G. was born in December 2016 and the father knew he needed to support her. Three and one-half years later, he had not attempted to increase his earnings. Second, the father knew the mother sought to

11

impute income and he received the vocational expert's report in May 2018.  The court began imputing income more than two years later.  This is unlike the timeline in *Schmir*.

The father had notice.  The court's order was proper and the father must heed it.  (See *Moss v. Superior Court (Ortiz)* (1998) 17 Cal.4th 396, 423 [court may impose contempt sanction or criminal penalty for violation of support order based on earning capacity where parent's failure to seek and accept employment causes inability to comply with order].)

C

The court did not abuse its discretion when it imposed $10,000 in sanctions.

The Family Code permits courts to award attorney fees and costs as a sanction if a party's uncooperative conduct hinders settlement.  (§ 271, subd. (a).)  Courts cannot impose sanctions that cause an unreasonable financial burden.  (*Ibid.*)

We review an order for sanctions for an abuse of discretion. (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1478.) We affirm unless, considering all evidence in favor of the trial court's order, no judge could reasonably make the order.  (*Ibid.*)

Evidence supported the order.  The mother testified the father refused her requests and compromises about A.E.G.'s pick-up location and he insisted on speaking only to her lawyer.  The father disagrees and claims he was cooperative.  The mother's testimony supported the court's order, however, and the court did not abuse its discretion by accepting her account.

The father's manufactured claim about the mother kicking him was another ground for sanctions.  On appeal, the father incorrectly contends he proved the mother kicked him and caused a bruise.  The video matches the trial court's description:  The

12

mother's foot brushed the father. The court properly treated the father's conduct and the photos of bruises with distrust. The father consumed time in both phases of trial litigating this false claim. Together with the father's other conduct, the court reasonably ordered sanctions.

The sanctions are not an unreasonable financial burden on the father because he had accounts with over $180,000.

D

The father has waived two issues for lack of briefing. First, in the fact section of his brief, he asserts he was "improperly impeached." The father does not provide legal support for his claim, nor does he raise the issue in his brief's argument section. Second, the father asks us to dismiss and vacate the seek work order. He mentions this order once in his brief without legal argument. The father has therefore waived contentions about these two issues. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

**DISPOSITION**

The judgment is affirmed. Costs are awarded to O.E.


WILEY, J.


We concur:



STRATTON, P. J.                    GRIMES, J.


13