Filed 3/28/24  Vera v. Haddad CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| PASCALE N. VERA,<br><br>　　　　Appellant,<br><br>　　v.<br><br>NABIL HADDAD,<br><br>　　　　Respondent. | B326699<br><br>(Los Angeles County<br>Super. Ct. No. 22PDFL00218) |

　　　　APPEAL from findings and orders of the Superior Court of Los Angeles County, Sarah J. Heidel, Judge.  Affirmed.

　　　　Salisbury, Lee & Tsuda, Salisbury, Shaw, Lee & Tsuda, Lee W. Salisbury and Jason Jen-Sen Lee for Appellant.

　　　　Harris Ginsberg, Andrea Fugate Balian; Ribet & Silver and Claudia Ribet for Respondent.

———————————————

The purpose of temporary spousal support awarded under Family Code section 3600 is to maintain the status quo as to the parties' living conditions and standards pending trial and division of their assets. (*In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327.) Appellant Pascale N. Vera appeals from the order awarding her temporary spousal support. She challenges the court's exclusion from income available for support: (1) retained earnings respondent Nabil Haddad testified he needed to fund a plan aimed at modernizing his business, CompSpec, Inc. (CompSpec or CSI); and (2) interest on those funds, including interest at a higher rate than the funds were earning at a bank with which Haddad had a longstanding financial relationship.

This appeal turns on whether the family court abused its discretion in making these rulings. We conclude it did not and affirm.

## BACKGROUND

Our appellate record contains documents regarding temporary spousal support, specifically Vera's initial request, Haddad's response, and Vera's reply. The court also admitted the parties' declarations but neither party testified. Both parties' experts testified on direct and cross-examination. We summarize only those facts pertinent to the issues on appeal.

According to Vera, she married Haddad in 2000 and they separated in 2022. Vera and Haddad have two children, currently adults. Child support, however, was not at issue. The parties agree that Haddad "owns and operates" CompSpec, which

2

provides computer systems to assist healthcare providers.[1] Haddad started the business prior to marrying Vera. Because CompSpec is an S Corporation,[2] its income is taxable as personal income. The parties own 10 residential properties, eight of which are rental properties. The parties also have income from other investments.

1. *Vera's request for spousal support*

On April 18, 2022, Vera filed a request for spousal support.[3] Attached to her request for spousal support is an income and expense declaration, indicating that her monthly expenses were $75,901.

Vera acknowledged this income and expense declaration was a "guesstimate." In her declaration, Vera explained that during their marriage, Haddad alone managed assets, accounts, and expenses. According to Vera, "Although we have lived a high [end] luxury lifestyle for a number of years, it is very difficult for me to accurately and precisely estimate what the cost of our lifestyle has been because [Haddad] has excluded me from most of the information that would be necessary to accurately estimate

---

[1] Whether CompSpec is separate or community property is not before us.

[2] Vera's expert testified that because CompSpec is an S corporation "whatever income the corporation makes is taxed on a personal level" and reported on the parties' personal tax returns.

[3] Vera also requested attorney fees and costs. She subsequently withdrew her request for attorney fees when the parties reached an agreement on using community property to fund hiring attorneys and accountants.

the cost of our lifestyle. My Income and Expense Declaration is therefore merely a guesstimate of what is necessary to maintain the kind of lifestyle we have enjoyed and may be subject to major adjustments once my attorney and forensic accountant have been able to obtain more accurate information and documentation."

Certified public accountant Jack Zuckerman submitted a declaration on Vera's behalf. Zuckerman concluded that in 2020, Haddad's income available for support was $4,981,150, including Haddad's wages and salary and $4.4 million in additional income attributed to CompSpec's retained earnings.

## 2. *Haddad's response*

Haddad filed a responsive declaration. His expert, Jason Wegis, a certified public accountant, filed a declaration in support of Haddad's declaration.

Haddad stated in his declaration that CompSpec was the family's main source of income. Haddad founded the company in 1989 and was the sole owner since 2002. According to Haddad, "CompSpec is contracted on a contingency basis with hospitals to assist their indigent and uninsured patients in obtaining Medi-Cal and other government supported programs."

Haddad also stated, "In 2016, I came to the conclusion that CSI was in serious jeopardy of going out of business in the next few years due to the new government regulations, expected fee change[s] and [a] tougher competitive environment." In 2016, Haddad hired an expert to develop a business plan for CompSpec "to survive and grow." The business plan called for CompSpec to retain $12 million in reserves. The $12 million would fund (1) purchase of another company ($6 to $7 million); (2) integration of the new company's systems with CSI's systems ($100,00 to $200,000); (3) integration of MDX, a billing company

4

CompSpec had already purchased ($500,000 to $700,000); (4) growth including increasing labor costs ($1 million to $2 million); and (5) acquisition of an out-of-state company regarding Medi-Cal eligibility ($2 to $3 million). Haddad represented, "[T]he ability of CSI to continue to retain enough earnings to implement the business plan is of paramount importance to the sustainability of the company."

Haddad claimed that to implement the business plan, CompSpec signed an agreement to purchase MDX, a billing company, for $1. In 2018, CompSpec started discussions with an "early out company" and in 2022, CompSpec signed a nondisclosure agreement with the same company. (According to Wegis, "early-out" services result in fewer accounts moving to collections.) The projected cost of this acquisition was between $6 and $7 million with an additional $200,000 to $300,000 needed to integrate the new company with CompSpec. CompSpec also needed funds to "complete the acquisitions of auxiliary product lines, acquisition of smaller competitors that are based in other states, and the integration of the new companies. . . ." Haddad did not want to deplete the parties' personal savings to fund CompSpec's growth.

To build CompSpec's reserves, Haddad reduced distributions from CompSpec to himself. From 2018 through 2021, he averaged $425,000 annually "in distributions." Haddad also stated, "[Vera's] request for the Court to order spousal support based upon the income of CSI, instead of the distribution . . . which I actually receive would eliminate the ability of CSI to continue to implement the business plan which began in 2017. . . . [I]f CSI cannot retain earnings and implement the business plan, then the company will not be able

to continue." Haddad also attached to his response a summary of CompSpec's November 30, 2016 strategic plan. Haddad offered to pay temporary spousal support of $21,589 monthly when Vera moved out of the family residence.

In his declaration, Wegis explained that since the end of 2017, CompSpec distributed to Haddad "funds . . . needed to pay personal income taxes, as well as an additional $425,000 annually on average." Wegis represented that CompSpec's income decreased by 31 percent from 2015 to 2016. As a result of this decrease, CompSpec developed a new business plan. In February 2018, CompSpec negotiated for the acquisition of a business costing approximately $6 to $7 million but the discussions "were put on hold" because CompSpec did not have adequate funds. In April 2022, CompSpec began conducting due diligence to acquire the business. Additionally, CompSpec acquired a different business for $1 and anticipated needing to spend between $500,000 and $700,000 to update that business's software.

Wegis disagreed with Zukerman's inclusion of retained earnings and interest as Haddad's income available for support. Wegis explained: "Mr. Zuckerman took a different approach, calculating Nabil's income based on a methodology that requires CompSpec to distribute 100 percent of its income and alter the business plan it has been implementing since 2017." Wegis opined distributing those reserves "could put CompSpec in financial danger and jeopardize the primary source of income for the parties . . . ." Wegis calculated spousal support at $21,589

using the DissoMaster[4] based on the assumption that CompSpec could continue to distribute $425,000 annually to Haddad. Wegis reported that as of July 2022, CompSpec transferred funds into an account bearing interest at a .01 percent rate.

Wegis analyzed Haddad and Vera's monthly expenses from March 1, 2021 through February 28, 2022. He concluded that Vera's total monthly expenses were $25,138. There is no evidence in our record that Vera contested this opinion.

In his memorandum of points and authorities, Haddad argued, among other contentions, that CompSpec's undistributed earnings should not be considered in determining monthly spousal support.

### 3.    *Vera's reply*

Vera asserted in her reply declaration that during the marriage, she had "unrestricted access to charge expenses on [her] American Express card." Vera represented because Haddad "has chosen not to share information with me throughout our marriage regarding our income, assets, and his business, I am not able to comment on his description of the current status of his business and his plans for its future."

Zuckerman also submitted a reply declaration, in which he opined Haddad's income available for support was $228,012 per month, of which $211,500 would be from CompSpec. Zuckerman imputed additional available income based on adding interest on CompSpec's reserves. Zuckerman opined that $17,250 monthly in interest could accrue if the reserves were moved from a then

---

[4] The DissoMaster is a computer program family courts and practitioners use to calculate support. (See *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 523, fn. 2.)

noninterest-bearing Bank of the West account to a Charles Schwab Value Advantage Money Fund earning 2.36 percent interest. Zuckerman further opined, "[R]etaining current income in CompSpec's bank account as a reserve is unnecessary" because "S Corporation income flows through to the taxpayer/shareholder who pays tax on the S Corporation income . . . ." According to Zuckerman, Haddad had sufficient savings outside CompSpec to cover CompSpec's acquisition expenses.

In her "reply points and authorities" (capitalization omitted), Vera reiterated that Haddad's funds available for temporary spousal support should not be "radically adjusted downward to account for [his] alleged strategic plan." Vera also asserted that the parties have a history of saving money during the marriage. She also argued she was entitled to $150,000 for relocation funds.

### 4.    *Hearing*

At a hearing concerning temporary spousal support, Vera's counsel stated, "[T]he large difference between us, is whether or not the capital reserves that Mr. Haddad has built up are necessary or not. And that's our major area of disagreement."

Zuckerman testified CompSpec had $8.7 million in reserves which could "be withdrawn tax-free to a certain degree . . . ." Zuckerman, however, acknowledged that if Haddad transferred the entire 8.7 million into a personal account, he might incur additional tax liability. Zuckerman testified that if CompSpec needed $12 million to purchase a business in keeping with Haddad's business plan, Haddad could use personal savings, including stocks and bonds, to contribute capital to CompSpec. Zuckerman, however, conceded the standard restraining order in divorce proceedings would prevent Haddad from utilizing those

8

funds for his business plan without Vera's written consent. Zuckerman acknowledged CompSpec was in negotiations to purchase a business that Zuckerman believed would cost CompSpec around $8 million. (Haddad's counsel stated the purchase price was in the $6 to $7 million range, not $8 million.)

At a continued hearing, Zuckerman testified CompSpec could put its $8.7 million reserve in an account earning 3.85 percent interest. Zuckerman acknowledged he had not evaluated Vera's needs based on the marital standard of living.

Testifying for Haddad at the continued hearing, Wegis explained CompSpec was then earning 1.25 percent interest in an account at Bank of the West and that placing the reserves in a higher interest-bearing account would have no effect on Haddad's income because the differential in interest would still be part of CompSpec's reserves. Wegis stated CompSpec's relationship with Bank of the West was "extremely important to CompSpec" and that a $6 or $7 million acquisition was currently being negotiated and may require a line of credit from Bank of the West. Wegis further testified CompSpec's "economic picture" was trending downwards.

Wegis added that since 2018, CompSpec had distributed on average $425,000 annually to Haddad after payment of taxes. Wegis opined Vera would not have to alter her standard of living if the court calculated support based on CompSpec's distributions to Haddad over the preceding four years (2018–2022).

Vera's counsel countered, "So I think the appropriate order to be made, at least on a pendente lite order, would be a spousal support order, under the DissoMaster, following the DissoMaster guidelines, that does not give Mr. Haddad credit for these capital reserves that he's still trying to build up . . . and should also

impute the additional income that's available of 3.8 percent on the 9.2 million [in CompSpec's capital reserves]." Counsel continued, "So, again, I don't have a DissoMaster to present to the court, but I believe those are the principles that the court should consider in making its orders."

The court inquired about Vera's income and expense declaration and whether she was seeking $75,901 in monthly expenses. Counsel responded, "[W]e'll refine it, but it would be in the neighborhood of about 35 to $39,000, per month plus their sharing half of the . . . rental income, one-half of the dividends and interest, on a pendente lite basis. And I believe that that amount [rental income, dividends, and interest] roughly—accountants have agreed the total amount is about $23,000 a month" with Vera's share at about $11,500 monthly.

Haddad's counsel reminded the court that Vera had offered no evidence impugning Wegis's calculation of the marital standard of living. Counsel also argued Vera did not contradict anything in Haddad's declaration about CompSpec's business plan. Counsel added, "[T]he only evidence before this court is that this company [CompSpec] put a business plan in place in 2017, that it has the need for the capital reserves. . . . And there is a specific list provided to the court of what the expenditures are anticipated to be in the very near future." Counsel summarized that Vera's monthly income, including the spousal support, rental income, dividends and interest, exceeded her monthly consumption.

5.      *Family court's order*

In a nutshell, the family court agreed with Haddad. Specifically, it found, "[W]hat you're [Vera's counsel] suggesting, is it's really getting at the heart of how Mr. Haddad runs his

business, and you want to get in there and micromanage certain aspects of it in a way that would be advantageous to your client's temporary spousal support calculation."  The court continued, "[Y]ou're only looking at these two little aspects of this business, instead of looking at the whole picture, and you've picked two places where you said, 'I think you should do it differently.'  And I don't know that it makes sense to let somebody else come in and micromanage little aspects of the decision-making in the business."

The court noted its broad discretion to determine what income is available for temporary spousal support.  In exercising that discretion, the family court agreed with Haddad in not including CompSpec's reserves or interest on those reserves as available funds for support.  It reasoned there was a strategic plan in place since 2017 that "was executed for a number of years."  Accordingly, the court stated it was "going to exercise [its] discretion and find that the money that was in CompSpec being used to capitalize the business . . . is income that's not available for support for purposes of calculating guideline spousal support."[5]

The family court also exercised its discretion not to impute interest on those reserves or at the higher Charles Schwab rate although "reasonable minds could differ."  The court credited the importance of Haddad's relationship with Bank of the West.  Additionally, the court ordered that any interest CompSpec made on its reserves would remain in the company.

---

[5] The court indicated the parties had reserved for a later date determining whether Vera has a community property interest in CompSpec's capital reserves.

The court also ordered the parties to share equally income from the rental properties and dividends and interest from separate and community accounts except for the parties' personal checking accounts. The court further ordered Haddad to pay $150,000 to Vera as a community property distribution, the amount requested by Vera for relocation expenses. The court ordered Haddad to pay temporary spousal support of $21,565 after Vera vacated the family residence. The court also found that the spousal support combined with Vera's other income sources would cover her expenses.

## DISCUSSION

Vera contends "speculative business expenditures that have not been incurred are not deductible from cashflow available for support" and "interest should be imputed to the capital reserves and included in cashflow available for support." (Boldface & capitalization omitted.) Vera also claims prejudice from these alleged errors because (1) the court's order is insufficient to maintain status quo; and (2) insufficient temporary spousal support orders may affect permanent spousal support. We conclude the applicable standards of appellate review are dispositive and under those standards, Vera has failed to demonstrate error. Finding no error, we do not address Vera's claims of prejudice.

"The trial court has broad discretion to determine the amount of temporary spousal support, considering both the supported spouse's need for support and the supporting spouse's ability to pay." (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442.) "As a general rule, we review spousal support orders under the deferential abuse of discretion standard. [Citation.] We examine the challenged order for legal and factual support.

12

'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.' [Citations.] 'To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be upheld "as long as its determination is within the range of the evidence presented." ' [Citation.]**6** (*Marriage of Blazer*, at p. 1443.) Under the abuse of discretion standard of review, we view the evidence in the light most favorable to the trial court's order. (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682.)

The court found, pursuant to Haddad's 2017 strategic plan, that CompSpec was using retained earnings "to capitalize the business." The court rejected Vera's argument that the evidence did not support CompSpec's need to retain its earnings to fund the acquisition expenditures Haddad had outlined in his declaration. The court's factual findings are supported by substantial evidence, most significantly, by Haddad's declaration in which he outlined CompSpec's needs for the reserves and attached a 2017 business plan developed before the parties' separation.

Although CompSpec had not yet made the expenditures outlined in Haddad's declaration, the evidence, including the Haddad and Wegis declarations, supports the inference CompSpec was likely to incur the acquisition expenditures to effectuate its business plan and the expenditures were not speculative. Put differently, Vera's argument that speculative

---

**6** Vera advocates that we should review the family court's order de novo because the facts are undisputed. Because CompSpec's need for the reserves was a disputed fact, de novo review is not appropriate.

13

business expenses cannot be excluded from funds available for support is based on a view of the facts the court rejected.

Vera argues the court erred in not imputing a higher interest rate available at Charles Schwab to CompSpec's reserves.[7]  In so arguing, Vera relies on her expert's testimony without taking into account that we view the evidence in the light most favorable to the court's order.  The court credited Wegis's testimony that CompSpec needed a continued business relationship with Bank of the West to effectuate CompSpec's business plan.  Further, the court credited CompSpec's need for $12 million in reserves to fund the 2017 business plan, which in turn, supported the conclusion that interest, at either financial institution's rate, should remain in the reserves.  The "ultimate determination of whether to include" interest from CompSpec's reserves in Haddad's income was "entrusted to the [family] court's discretion" (see *In re Marriage of Pletcher* (2021) 68 Cal.App.5th 906, 919), and Vera demonstrates no abuse of that discretion.[8]

---

[7] On appeal, Vera states Zuckerman "testified that [Haddad] could obtain interest of 3.85 percent in a Charles Schwab money market account" and the failure to obtain that interest amount indicated that the reserves were "underutilized and the trial court should have imputed a reasonable rate of return."

[8] In her reply brief, Vera argues (1)"[t]he status quo includes the parties' history of saving funds in CompSpec"; (2) "[Haddad]'s ability to pay goes far beyond the actual distributions he receives"; and (3) [Vera]'s need for spousal support includes the need to save."  (Boldface omitted.)  We do not consider arguments Vera makes for the first time on

14

Vera argues *In re Marriage of Berger* (2009) 170 Cal.App.4th 1070 stands for the principle that Haddad "should not be able to unilaterally, and voluntarily, arrange his business affairs to preclude [Vera] from maintaining the status quo." Assuming *Berger* supports this proposition, the court did not find that Haddad had "arrange[d] his business affairs to preclude [Vera] from maintaining the status quo," and substantial evidence supports the court's rejection of this contention.

We emphasize that our ruling concerns only temporary spousal support and is not intended to reflect how the issue of available funds for purposes of permanent spousal support should be resolved.

---

appeal in her reply brief. (See *Foxen v. Carpenter* (2016) 6 Cal.App.5th 284, 295 [failure to raise argument in appellant's opening brief forfeits the argument]; *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 ["Courts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge."].)

15

## DISPOSITION

The temporary support order is affirmed.  Nabil Haddad is entitled to his costs on appeal.

<u>NOT TO BE PUBLISHED.</u>


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



CHANEY, J.

16